State of Maryland v. Keith Krikstan, No. 18, September Term, 2022

**CHILD ABUSE – SEXUAL ABUSE OF A MINOR – ACT THAT INVOLVES SEXUAL EXPLOITATION – SUFFICIENCY OF THE EVIDENCE** – Supreme Court of Maryland* held that evidence was sufficient to support substitute teacher's conviction for child sexual abuse based on teacher's in-school discussion with minor about teacher's anger or jealousy over minor's affection for another adult man amidst teacher's ongoing sexual exploitation of minor outside of school, via electronic and telephone communications. Teacher's in-school discussion with minor of his anger or jealousy regarding minor's affection for another adult man constituted act that involved sexual exploitation, where teacher had established unquestionably sexually exploitative relationship with minor outside of school, and teacher's in-school conduct related to, affected, or was part of out-of-school sexual exploitation of minor.

Supreme Court of Maryland held that evidence was sufficient to demonstrate that teacher's expression of anger or jealousy to minor in school related to, affected, or was part of out-of-school exploitation of minor, fulfilling requirement that State show teacher engaged in act that involved sexual exploitation while having permanent or temporary care or custody or responsibility for supervision of minor.

*At the time of oral argument in this case, the Supreme Court of Maryland was named the Court of Appeals of Maryland. At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

Circuit Court for Charles County
Case No. C-08-CR-18-000694

Argued: December 6, 2022

IN THE SUPREME COURT

OF MARYLAND*

No. 18

September Term, 2022

_____

STATE OF MARYLAND

v.

KEITH KRIKSTAN

_____

Watts
Hotten
Booth
Biran
Gould
Eaves
Battaglia, Lynne A. (Senior
Justice, Specially Assigned),

JJ.

_____

Opinion by Watts, J.
Hotten, Eaves, and Battaglia, JJ., dissent.

_____

Filed: February 27, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

*At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

In Maryland, a criminal statute governing child sexual abuse prohibits, among other things, a "person who has permanent or temporary care or custody or responsibility for the supervision of a minor" from causing "sexual abuse to the minor." Md. Code Ann., Crim. Law (2002, 2021 Repl. Vol.) ("CR") § 3-602(b)(1). For conviction under the statute, the person must have care, custody, or responsibility for supervision of the minor at the time the person engages in "an act that involves" sexual exploitation of the minor. CR § 3-602(a)(4)(i).

In this case, we must determine whether the evidence was sufficient to support the conviction of Keith Krikstan, Respondent, for sexual abuse of a minor. The issue is whether Krikstan engaged in acts that involved sexual exploitation of the minor at a time that he had responsibility for the minor's supervision. At bottom, this case raises the question of whether, for purposes of the sufficiency of the evidence to establish a conviction under CR § 3-602, the in-person conduct of an adult who has responsibility for the supervision of a minor and is indisputably sexually exploiting the minor by electronic communications at times when the person does not have responsibility for the minor's supervision should be viewed in isolation, or whether the in-person conduct should be assessed in the context of other known sexually exploitative acts.

In this case, 30-year-old Krikstan, a substitute teacher, was charged with sexual abuse of a minor after his out-of-school sexually exploitative relationship with A.G.,[1] a 12-year-old middle school student, came to light. Krikstan, who worked on-and-off as a

---

[1]In accordance with Maryland Rule 8-125(b)(1), the minor is referred to by her initials.

substitute teacher at A.G.'s middle school, engaged in a sexually exploitative relationship with the 12-year-old student through cell phone text messages, an electronic messaging application, and video chats outside of class. Krikstan first met A.G. when he was teaching as a substitute in her seventh-grade science class. Krikstan began texting A.G., quickly becoming what she considered "more than" a friend. Krikstan professed his love for A.G., doing so over 100 times. Krikstan asked to see A.G.'s "butt," either clothed or bare. A.G. sent photos of her buttocks, sometimes bare, to Krikstan 10 to 15 times. According to A.G., Krikstan showed her part of his penis on several occasions when they video chatted. In other conversations, Krikstan discussed his desire to have sex with A.G.

After a few weeks of these communications, A.G. told Krikstan that she was interested in a 21-year-old man named Joey.[2] Krikstan became upset, told A.G., among other things, that he had "loved" her but was "done[,]" and wished her a "great life with Joey." A.G. testified that Krikstan "was mad at" her and that he sent her a message through Snapchat telling her the things above. A.G. saved the message because parts of it made her "feel good." In the midst of this emotional turmoil, Krikstan returned to A.G.'s school as a substitute teacher and discussed with her his negative feelings about her having expressed an attraction to the 21-year-old man. Specifically, Krikstan substitute taught A.G.'s math class. Once there, Krikstan gave A.G. a late pass to stay after math class. After class, while A.G. was still in the classroom, Krikstan conveyed to her that he was mad and upset with her because of her feelings for the other adult man.

---

[2]At trial, A.G. testified that Joey was 21 years old and did not go to her school, and that she knew him "[t]hrough a haunted house that [she] work[ed] at."

After this conversation at school, Krikstan resumed sexually exploiting A.G. regularly, by telephone and electronically outside of school hours, telling her that he loved her and wanted to have sex with her. These electronic communications were often intensely romantic and graphically sexual. One exchange involved Krikstan instructing A.G. how to masturbate using a pillow, which she did, and afterward Krikstan messaged the 12-year-old that he had visualized her "riding a cock." None of the explicitly romantic or sexual exchanges occurred at school.

Approximately two months after Krikstan substitute taught A.G.'s math class, Krikstan again elected to substitute teach one of A.G.'s classes after another conflict about A.G's feelings for the other man and emotional conversations with A.G. That day, another student reported to a school official the nature of the relationship between Krikstan and A.G., and Krikstan was later arrested. Krikstan was convicted of sexual abuse of a minor.

Despite the circumstances of the numerous sexually exploitative acts by Krikstan through electronic communications that preceded him expressing his anger to A.G. about her attraction to another man in school after her math class, and that his sexual exploitation of A.G. continued after the conversation in school, the Appellate Court of Maryland[3] reversed his conviction for sexual abuse of a minor, theorizing that he had not "said or implied anything sexual" in his conversation with the minor in school. Keith Krikstan v. State, No. 2279, Sept. Term, 2019, 2022 WL 1284081, at *1, *6 (Md. App. Ct. Apr. 29,

---

[3]At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

2022).

The State contends that the Appellate Court of Maryland erred because the in-school conversation after A.G.'s math class involved the sexual exploitation outside of school, providing sufficient evidence for conviction. The State relies on our definition of an act that "involves" sexual exploitation as an act "relating to" such exploitation, Degren v. State, 352 Md. 400, 419, 722 A.2d 887, 896 (1999) (cleaned up), and argues that the in-school conversation was a continuation of a discussion that arose in the exploitative relationship and related to sexual exploitation, as a 30-year-old teacher expressed jealousy to a 12-year-old about her affection for another adult man. Krikstan contends that the Appellate Court of Maryland properly vacated his conviction because there was insufficient evidence that he was responsible for A.G.'s supervision at any time that his sexually exploitative conduct occurred. This is so, Krikstan argues, because the State did not present sufficient specific evidence of his intention with respect to the in-school conversation after math class, or the content of the conversation or how the conversation benefited him.

Against this background, we hold that the evidence was sufficient to support Krikstan's conviction of sexual abuse of a minor under CR § 3-602. We conclude that to support a conviction under CR § 3-602, where a person has sexually exploited a minor through electronic communications at a time that the person did not have care, custody, or responsibility for the supervision of the minor, there must be a showing that the person engaged in an act that related to, affected, or was a part of the out-of-school sexual exploitation of the minor when the person had care, custody, or responsibility for

- 4 -

supervision of the minor. The occurrence of sexual exploitation outside of the perpetrator's time of responsibility for supervision of the minor may be used to establish child sexual abuse under CR § 3-602, but there must be a showing that the perpetrator engaged in an act relating to, affecting, or that was a part of the sexual exploitation while the perpetrator was responsible for the care, custody, or supervision of the minor. That the act at issue relates to, affects, or is a part of sexual exploitation of the minor need not be shown through direct evidence; rather, the showing may be accomplished though evidence that permits a rational trier of fact to find that the act is related to the sexual exploitation of the minor. In addition, the act taken while the person is responsible for the care, custody, or supervision of the minor need not be of a sexual or criminal nature. It is enough that the act relates to, affects, or is a part of the sexual exploitation of the minor.

Our holding today flows directly from <u>Degren</u>, 352 Md. at 419, 722 A.2d at 896, a case in which we affirmed a conviction for child sexual abuse under Md. Code (1957, 1996 Repl. Vol.), Art. 27, § 35C (a predecessor to CR § 3-602), and in doing so considered the meaning of the phrase "involves sexual molestation or exploitation" and explained that the word "involves" "connotes a broad sense of inclusion, such as an act *relating* to sexual molestation or exploitation." (Citing Merriam-Webster's Collegiate Dictionary 617 (10th ed.) ("defining 'involve' as 'to engage as a participant' or 'to have an effect on' and 'involved' as 'being affected or implicated'")) (emphasis in original). Our conclusion is also consistent with our holding in <u>Walker v. State</u>, 432 Md. 587, 622-23, 69 A.3d 1066, 1087-88 (2013), in which we discussed that sexual exploitation is not limited to incidents involving physical contact and can include a wide range of behavior. In <u>Walker</u>, <u>id.</u> at 622,

69 A.3d at 1087, we explained that:

> Our review of Maryland case law leads us to several conclusions about [CR] § 3-602. The statute . . . can encompass a wide range of behavior that need not, in itself, be criminal. Child sexual abuse can be committed as part of a single act or a series of actions and it is not necessary that the defendant physically touch the child in order to commit the crime. The context in which the abuse occurs matters and failing to act to prevent abuse can be criminal. Finally, exploitation requires that the defendant "took advantage of or unjustly or improperly used the child for his or her *own* benefit."

(Quoting Degren, 352 Md. at 426, 722 A.2d at 900) (emphasis in original).

In this case, the evidence demonstrated that Krikstan's in-school conduct fell squarely within the meaning of the language of the statute providing that sexual abuse means an act that involves either sexual molestation or exploitation of a minor, regardless of whether physical injuries occur or not. In the classroom after math class, Krikstan discussed with A.G. his anger and demonstrated jealousy over her attraction to another adult man. At the time of the in-school interaction, A.G. had already informed Krikstan of her attraction to the other man in the context of a sexually exploitative relationship conducted through electronic communications, and Krikstan had already expressed his anger about the other adult man while communicating with A.G. during the existing out-of-school sexually exploitative relationship. And, after the in-school display of anger, Krikstan continued the out-of-school sexual exploitation, which included emotionally charged electronic communications about whether A.G. loved Krikstan or the other man.

A rational juror could easily have found that Krikstan's reiteration in the classroom of his angry, jealous reaction to A.G.'s feelings for another man related to, affected, or was a part of the ongoing sexual exploitation of A.G. outside of school. By returning to the

- 6 -

classroom as her substitute teacher and discussing his anger with A.G. at school, Krikstan continued his sexual exploitation of the minor by conveying the same anger and jealousy that he had demonstrated earlier in an exploitative electronic communication, when he said he had "loved" her but was "done" with her. After his in-school demonstration of anger and jealousy about the other adult man, Krikstan resumed sexually exploiting A.G. outside of the classroom, including by sending her messages about the other adult man and, among other things, causing her to engage in acts of masturbation.

Under these circumstances, a rational fact-finder could readily have found beyond a reasonable doubt that Krikstan's expression of anger in the classroom about the other adult man was related to or affected the out-of-school sexually exploitative relationship and, indeed, was a part of or constituted a continuation of the exploitative relationship, given that Krikstan expressed the same sentiments in school that he had earlier in an inappropriate electronic communication and that he resumed the same type of sexually exploitative electronic communications with A.G. after the classroom conversation as he had engaged in with her before.

Under the language of the statute and our case law, it was not necessary for Krikstan specifically to say or imply anything sexual during the classroom conversation. The legislative history of the statute indicates an intent by the General Assembly that the statute be interpreted broadly to include a wide range of conduct and to protect children. With these principles and the evidence presented at trial in mind, it is clear that the evidence was sufficient for a rational juror to have found that Krikstan's in-school acts met the definition of conduct involving sexual exploitation of a minor.

Upon concluding that the evidence is more than sufficient to support Krikstan's conviction, we reverse the judgment of the Appellate Court of Maryland.

## BACKGROUND

Krikstan was charged with sexual abuse of a minor and related offenses. The material facts are essentially undisputed. Krikstan was 30 years old when he met A.G. while substitute teaching in her seventh-grade science class. A.G. was 12. A.G. testified that during that class, in autumn of 2017, Krikstan asked her what a 12-year-old friend of hers "had told [A.G.] about him." A week later, Krikstan texted A.G., after receiving her phone number from the same 12-year-old friend, whom A.G. described as her best friend. According to A.G., after about a week of daily "[n]ormal conversation" by text between the two, Krikstan asked for her school schedule so that he could "keep an eye out" for her, which A.G. shared. Shortly thereafter, at Krikstan's request, Krikstan and A.G. began to communicate via Snapchat, a phone-based messaging application on which messages, photos, and videos can be sent, but will automatically disappear if they are not affirmatively saved.

Early in their interactions, Krikstan told A.G. that he "loved" and "wanted to be with" A.G.'s 12-year-old best friend, from whom he had gotten A.G.'s number. However, within a few weeks of communicating, Krikstan was telling A.G. that he loved her, and she said the same back to him. A.G. testified that their relationship at the time was one of "[f]riends with benefits" because she and Krikstan "were doing more than what friends would normally do." A.G. estimated that Krikstan told her that he loved her over 100 times.

- 8 -

Via Snapchat, Krikstan asked to see the 12-year-old's "butt," either clothed or bare. A.G. responded but did not send a photo, because she "knew it was wrong." When Krikstan asked again later the same day, A.G. sent a photo. She did so because Krikstan's request "felt forceful," and "[h]e had asked before and then asked again, so it felt like [she] had to." In explaining her decision to send the photo, A.G. testified that she "loved" Krikstan and that she felt that if she did not send the picture, she "would lose him" as "[a] person that would be there for [her]." Thereafter, A.G. sent photos of her buttocks, sometimes clothed, sometimes bare, to Krikstan 10 to 15 times, sometimes at his request and sometimes not. In addition, Krikstan began to communicate with A.G. nightly on FaceTime, an application on which video calls can be made via phone or computer; these video calls usually took place late at night or in the early morning hours after midnight. A.G. testified that, during these conversations, Krikstan showed her part of his penis via FaceTime 15 to 20 times.

After two-and-a-half to three weeks of Krikstan communicating with her, A.G. told him that she was interested in a 21-year-old man named Joey. A.G. testified that Krikstan "got upset." Krikstan sent her a message through Snapchat indicating that A.G. had "lost" two people "who really loved" her, and A.G. responded that she had caused him and herself "pain" that she "didn't want to feel again[.]" Krikstan then sent A.G. the following message through Snapchat:

> Well I can't speak for him Bc who knows if he really did but I can speak for me . . . I loved u so much u were the highlight and the reason I got up Bc I couldn't wait to talk to u to spend all day talking to u to making u smile that beautiful smile looking at ur beautiful eyes and gorgeous lips I would of and almost did risk everything just to kiss u to hold u u were my dream and it

then just turned into a nightmare. Just like that.
Fuck it
I'm done
Take care and hope u have a great life with Joey

(Ellipsis in original). A.G. testified that she saved the above message in part because "what he said" made her "feel good[,]" as Krikstan called her "beautiful" and "was saying all these sweet things[.]"

After the Snapchat message in which Krikstan told A.G. he was "done[,]" Krikstan substituted in A.G.'s math class.[4] This occurred after the time that they had discussed Joey and A.G.'s feelings for him. During her testimony, when asked whether Krikstan substitute taught her math class "during the time period about when [she] had told him about Joey" and they "were arguing about Joey[,]" A.G. responded "[y]es." When asked whether the Snapchat conversation in which Krikstan stated he was "done" occurred in "the days

---

[4]Krikstan was a short-term substitute teacher in Charles County, where A.G.'s middle school was located. Substitute teachers can view the available opportunities for substitute teaching via an online portal, where they can select which opening (based on school, time, and class) they wish to fill. A substitute in possession of a particular student's schedule could seek to substitute for teachers on the student's schedule, because of the available information about each opening. According to the record in this case, Krikstan elected to substitute teach at A.G.'s middle school four times during the course of the sexually exploitative relationship before his arrest: October 16, 2017, October 17, 2017, November 15, 2017, and January 11, 2018. Other than the January 11, 2018 class, the record does not reveal the date on or time at which Krikstan elected to substitute teach on the dates chosen.

Although A.G. testified that Krikstan spoke with her first in her science class in November, this would have been one of the October dates, and Krikstan's substitution in her math class was on November 15, 2017, not in December as A.G. recalled. That A.G. apparently advanced the dates by one month does not affect our analysis because A.G.'s testimony about the timeline was consistent otherwise, and she described the events in question in relation to Krikstan's substitutions in her science and math classes, and, on January 11, 2018, in her reading class.

leading up to math class or . . . after math class[,]" A.G. responded "[b]efore."

When Krikstan taught A.G.'s math class, Krikstan gave her a pass so that she could be late to the following class. Rather than go to her next class, A.G. stayed in the classroom talking to him about Joey and how Krikstan was mad and upset about the situation. At trial, when the prosecutor asked whether Krikstan expressed his feelings to her after class, A.G. responded: "Yes[,]" but she could not remember the specifics of what he said. A.G. testified that her impression was that Krikstan "was mad at [her] because [she] told him about Joey." The prosecutor asked: "So you guys are in math class, you stay after. You're having this communication with him regarding him being upset about Joey, right?" and A.G. responded, "Yes." A.G. testified that at the conclusion of the conversation in the classroom, she was not sure whether the issue was resolved and that Krikstan did not say whether he wanted to see her again. From A.G.'s perspective, Krikstan was "mad" at her and would not talk to her.

After the interaction in the classroom, Krikstan resumed communicating with A.G. and telling her that he loved her. This included numerous intensely emotional and sexual electronic exchanges. For example, on one occasion, Krikstan instructed A.G. to masturbate using a pillow, which she did. A discussion followed in which Krikstan took credit for teaching A.G. to masturbate with a pillow, as opposed to a different method, and advised that he fantasized about the 12-year-old "riding a cock." Krikstan stated that he "should stop talking to" A.G. because he was "corrupting" her and stated that he was "turning [her] into such a bad girl[.]" Krikstan stated he "love[d A.G.]'s dirty little slut side" and responded "God that's so hot" to A.G.'s message indicating that she did not know

- 11 -

she had such a side. In three or four additional conversations, between November and January, they talked about having sex with each other. All these exchanges happened at night, outside of school.

A.G. testified that she called Krikstan "Daddy" in a message on Snapchat with a heart emoji next to it because he told her before Christmas of 2017 to call him that. In an exhibit that was admitted into evidence by the State, in a Snapchat exchange, Krikstan told A.G. that she could call him "Keith" "[o]r daddy whichever [she] prefer[red.]" A.G. responded: "Daddy." A.G. also testified that she called Krikstan "Babe" as a nickname at a point in which her feelings were that she loved him.

After Krikstan had substituted in A.G.'s math class, he chose to return as a substitute teacher in A.G.'s reading class on January 11, 2018. This occasion also followed a "fight about Joey" and intense exchanges between A.G. and Krikstan concerning their relationship. In these interactions, Krikstan shared feelings of being rejected by A.G. because of her affection for Joey, prompting A.G. to reiterate her love and affection for Krikstan. For example, according to an Apple iPhone Logical Extraction Report that was entered into evidence, on January 8, 2018, A.G. told Krikstan, "You're perfect, amazing, handsome, loving, caring, I can't find anything better, even Joey[.]" In the same message, A.G. wrote to Krikstan:

> I can't be mad at you. I can't hate you. I can ALWAYS love you. There's nothing in this world that can stop any of those feelings. I love you too much to let you go. I don't want to say goodbye. I want you to stay for as long as you can, forever and always!

> On the same day, Krikstan messaged A.G.: "U love him[.] It's cool with me[.] I

knew it from beginning[.]" A.G. responded, "I do love you, and I'm going to admit, maybe not as much as I love him, but I still love yo[u]." An Apple iPhone Event Log entered into evidence shows that, over the next two days, Krikstan and A.G. engaged in FaceTime calls and sent additional text messages to each other. In one message sent on the night of January 10, 2018, before FaceTime calls, A.G. told Krikstan: "Fine but I'm only listening bc I don't feel like losing you!" It was after these exchanges that Krikstan returned to substitute teach A.G.'s reading class.

While Krikstan was substitute teaching on January 11, 2018, another student reported to a school official the nature of the relationship between Krikstan and A.G., leading to Krikstan's arrest.[5] In April 2019, a jury convicted Krikstan of sexual abuse of a minor. On January 7, 2020, the Circuit Court for Charles County imposed a sentence of 25 years of incarceration, with all but 9 years suspended, to be followed by 5 years of supervised probation. Krikstan timely noted an appeal.

**Opinion of the Appellate Court of Maryland**

On April 29, 2022, the Appellate Court of Maryland reversed the circuit court's

---

[5]A recorded police interview of Krikstan conducted on January 11, 2018 was entered into evidence at trial. During the interview with a detective, Krikstan characterized his relationship with A.G. as "just friendship." Regarding the conversation after math class, Krikstan stated: "She came to me one time [] after class because . . . she had a crush on like a 21-year-old and her mom axed it. She was upset about it, so . . . she came and talked to me about it." When the detective asked what advice Krikstan gave A.G. about the situation, Krikstan said: "Pretty much just try and stay -- you know, you don't want none of that stuff. . . . He's too old for you." Krikstan also told the detective that he had not spoken with A.G. before that conversation and that none of the messages or photos he exchanged with A.G. were "X-rated" or inappropriate. At trial, in closing argument, the prosecutor argued that portions of Krikstan's responses during the interview were false and constituted consciousness of guilt.

judgment, holding "that the evidence was not sufficient to support the judgment of conviction for sexual abuse of a minor under" CR § 3-602.  See Krikstan, 2022 WL 1284081, at *1.  The Appellate Court relied on our holding in Wicomico Cnty. Dep't of Soc. Servs. v. B.A., 449 Md. 122, 141 A.3d 208 (2016), to narrow the question facing it to whether Krikstan had temporary responsibility for supervision of the minor[6] at a time "when he engaged in sexually exploitative conduct."  Krikstan, 2022 WL 1284081, at *6.

The Appellate Court stated that the parties seemed to agree that Krikstan had temporary responsibility for supervision of the minor when he was a substitute teacher in her class.  See id.  However, the Appellate Court reasoned, Krikstan's responsibility for supervision of the minor ended with the school day and did not extend to the moments in time when he engaged in sexually exploitative conduct.  See id.  The Appellate Court disagreed with the State's argument that Krikstan "made sexual-in-nature comments when he talked with [the minor] personally during and immediately following the classes when he was a substitute teacher, while on school grounds and in the classroom."  Id.

The Appellate Court held that, to fit the definition of sexual exploitation, the acts in question need not be physical but must be "sexual," which can be either explicit or "merely have a 'sexual undertone.'"  Id. (citation omitted).  The Appellate Court held that the State presented no evidence that Krikstan "said or implied anything sexual" when he spoke with the minor at school during and after class.  Id.  The Appellate Court stated that "[t]he

---

[6]In the Appellate Court of Maryland's opinion, see Krikstan, 2022 WL 1284081, at *1 n.1, and the State's petition for a writ of *certiorari*, the minor is referred to as "N.," rather than her actual initials or name.

- 14 -

discussion about [the minor]'s feelings toward another man does not, without more, qualify as a sexual conversation." Id.

The Appellate Court was unpersuaded by the State's argument that Krikstan's decision to serve as the minor's substitute teacher and his conversations with her at school constituted "grooming." Id. at *7. The Appellate Court explained that Maryland "jurisprudence regarding the phenomenon of 'grooming,' particularly as it relates to child abuse, is not very well developed." Id. at *6. In light of this limited jurisprudence, the Appellate Court expressed uncertainty whether "grooming" could satisfy CR § 3-602(a)(4)(i). Krikstan, 2022 WL 1284081, at *7. But the Appellate Court decided that it did not need to resolve the question, because it found no evidence of "grooming" by Krikstan. Id. For these reasons, the Appellate Court held that there was not sufficient evidence that Krikstan's conduct in school constituted sexual exploitation. See id. at *8.

In a concurring opinion, the Honorable Christopher B. Kehoe explained that, from his perspective based on the legislative history of the criminal child abuse statute, a "historical accident" had led to the conclusion that "Krikstan's otherwise fully-warranted conviction for sexual abuse of a minor must be reversed[.]" Id. (Kehoe, J., concurring). Judge Kehoe explained that, in Maryland, early child abuse statutes emerged to supersede the common law exemption from liability for assault and battery applicable to parents and custodians disciplining children. See id. at *8-9 (Kehoe, J., concurring). The goal, wrote Judge Kehoe, "was not to decriminalize assaults and batteries on children by individuals who were neither parents nor custodians; rather the statute established enhanced penalties for those who had a duty to care for and protect children." Id. at *9 (Kehoe, J., concurring)

(citation omitted).  Judge Kehoe stated that, when the General Assembly added protections against sexual abuse of children, it built on this framework, while leaving in place the requirement that the perpetrator be a parent, custodian, or individual otherwise responsible for the care or supervision of a child.  See id. (Kehoe, J., concurring).

But, Judge Kehoe observed that because there was no "common law counterpart to the statutory offense of sexual abuse of a minor child[,]" CR § 3-602 establishes in the first instance "penalties for those who have a special duty to protect children in their care" rather than enhanced penalties for people who have such a duty, and creates no penalties for people who do not have care, custody, or responsibility for the supervision of children.  Krikstan, 2022 WL 1284081, at *9 (Kehoe, J., concurring).  Judge Kehoe stated that, as such, the statute's scope is limited, letting perpetrators like Krikstan off the hook.  See id. (Kehoe, J., concurring).  Judge Kehoe explained that "language that was intended to expand protection to children in 1963 and in 1976[] now operates to limit the protections that the law affords to children from forms of sexual abuse and exploitation" that were unforeseen decades ago.  Id. (Kehoe, J., concurring).  Judge Kehoe suggested that the General Assembly consider amending the statute to address this problem.  See id.  (Kehoe, J., concurring).

**Petition for a Writ of *Certiorari***

On June 15, 2022, the State petitioned for a writ of *certiorari*, raising the following two issues:

> 1. Was the evidence sufficient to find that a 30-year-old substitute teacher engaged in an act inside of school hours that "involves" sexual exploitation, where he specifically opted to substitute in the class of a 12-year-old student

- 16 -

and while still in the classroom expressed his jealousy about the 12-year-old's attraction to another man, given that he was engaging in a sexually exploitative relationship by way of electronic communications with this same student outside of school?

2. Was the evidence sufficient to find that the substitute teacher's acts and statements in class constituted grooming the 12-year-old, and does such grooming "involve" sexual exploitation where a sexually exploitative relationship is conducted outside of school?

On August 25, 2022, we granted the petition. See State v. Krikstan, 481 Md. 2, 281 A.3d 718 (2022).

# DISCUSSION[7]

## The Parties' Contentions

The State contends that the evidence at trial was sufficient for a rational juror to find that Krikstan engaged in an act during school hours that "involved" sexual exploitation. The State argues that the act was Krikstan's discussion, at school, with the minor of his jealousy of the other man to whom she was attracted, in the context of the ongoing sexually exploitative relationship. The State asserts that, if Krikstan took any act in the classroom, which included an act "related to, affected by, or having an effect on" the existing sexual exploitation, the act falls within the meaning of an act involving sexual exploitation. (Emphasis omitted). The State urges this Court to conclude that the in-person conversation after math class involved sexual exploitation because the conversation related to or had the effect of emotional manipulation related to ongoing sexual exploitation. The State asserts

---

[7]Given our holding as to question one, we need not address question two concerning whether Krikstan's actions at school constituted grooming and were sufficient on that ground to support a conviction under CR § 3-602.

that not only was the in-school conversation a continuation of the existing exploitation, but also it involved sexual exploitation on its own, as the conversation consisted of a 30-year-old teacher expressing jealousy to a 12-year-old about her affection for another adult man. The State argues that Krikstan "received a personal benefit from the manipulative pressure he applied in th[e classroom] conversation in terms of continuing or furthering his exploitative relationship with A.G."

Krikstan responds that the Appellate Court of Maryland properly vacated his conviction because the evidence was not sufficient to support a finding that he was temporarily responsible for the supervision of A.G. at any time that sexually exploitative conduct occurred. Krikstan asserts that the conversation after math class about the other man cannot support a conviction for sexual abuse. Krikstan characterizes the State's description of the conversation as an expression of "jealousy" as inaccurate because A.G. testified only that Krikstan was "mad" at her because she told him about Joey without further elaboration. Krikstan argues that because the State did not present specific evidence of his intention with respect to the in-school conversation, we cannot ascribe an intention to the conduct. Although acknowledging that, taken in the light most favorable to the State, the evidence demonstrated his communications outside of school with A.G. were sexually exploitative, Krikstan contends that, just as in B.A., his in-school actions "could not reasonably be interpreted as facilitating" those communications.

Krikstan contends that our holding in B.A., in which we affirmed an administrative law judge's finding that where a martial arts instructor had engaged in sexually exploitative conduct with a student via remote communications, the instructor's in-class conduct did

- 18 -

not constitute sexual exploitation under the Family Law Article, lends significant support for his position. Krikstan asserts that his interpretation of CR § 3-602 is confirmed by changes that the General Assembly made in 2017 expanding the scope of the parallel Family Law statute, which was the subject of B.A., but not CR § 3-602. Krikstan observes that the General Assembly amended the Family Law Article's definition of child sexual and non-sexual abuse to cover abuse by people "who, because of [their] position or occupation, exercise[] authority over the child." (Cleaned up) (alterations in original). For Krikstan, because the same change was not made to CR § 3-602, this means that the General Assembly was unwilling to expand the scope of criminal liability for child sexual abuse. In addition, Krikstan argues that the rule of lenity applies and that the judgment of the Appellate Court of Maryland should be affirmed on that basis.

**Standard of Review**

When reviewing the sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the State and assess whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Walker, 432 Md. at 614, 69 A.3d at 1082 (quoting Rivers v. State, 393 Md. 569, 580, 903 A.2d 908, 915 (2006)) (internal quotations mark omitted). Our role is not to review the record in a manner that would constitute a figurative retrial of the case. See id. at 613, 69 A.3d at 1082. This results from the unique position of the fact-finder to view firsthand the evidence, hear the witnesses, and assess credibility. See id. at 614, 69 A.3d at 1082. As such, "we do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence." Id. at 614, 69 A.3d at 1082 (cleaned up). Our deference to reasonable

- 19 -

inferences drawn by the fact-finder means we resolve conflicting possible inferences in the State's favor, because "[w]e do not second-guess the jury's determination where there are competing rational inferences available." Smith v. State, 415 Md. 174, 183, 999 A.2d 986, 991 (2010).

In contrast, statutory interpretation is a question of law, and, thus, our review of the meaning of a statute is *de novo*. See Lawrence v. State, 475 Md. 384, 398, 257 A.3d 588, 596 (2021).

**Analysis**

*Statutory Framework*

CR § 3-602(b) prohibits sexual abuse of a minor by certain categories of people. The statute provides that "[a] parent or other person who has permanent or temporary care or custody or responsibility for the supervision of a minor may not cause sexual abuse to the minor." CR § 3-602(b)(1). Although the language "responsibility for the supervision of a minor" is not defined in the statute, we have determined that "a school teacher has responsibility for the supervision of children in connection with [the teacher's] academic duties." Pope v. State, 284 Md. 309, 324, 396 A.2d 1054, 1063-64 (1979). Normally, such responsibility ends when the student leaves school grounds. See Anderson v. State, 372 Md. 285, 294, 812 A.2d 1016, 1022 (2002). However, a teacher's responsibility for supervision of a child can continue away from school, such as when based on the implied consent of the parents to "any reasonable assistance that a teacher may provide to assure the child's return home from school[,]" provided that there is no "temporal break" in the teacher-student relationship. Id. at 294, 812 A.2d at 1022 (citation omitted). In other

- 20 -

words, if there is a temporal break in the teacher-student relationship, the teacher's responsibility for supervision of the minor ends.

CR § 3-602(a)(4)(i) defines "sexual abuse" as "an act that involves sexual molestation or exploitation of a minor, whether physical injuries are sustained or not." Neither the term "involves" nor the phrase "involves sexual molestation or exploitation" in CR § 3-602(a)(4)(i) is defined in the statute. Therefore, we must use tools of statutory construction to discern the meaning of the word "involves" in the context of the statute. Our goal in statutory construction is to determine legislative intent. See Walker, 432 Md. at 615, 69 A.3d at 1083. We begin with the plain meaning of the statutory language in question. See B.A., 449 Md. at 134, 141 A.3d at 215. This is because we presume that the General Assembly

> meant what it said and said what it meant. When the statutory language is clear, we need not look beyond the statutory language to determine the General Assembly's intent. If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written.

Bellard v. State, 452 Md. 467, 481, 157 A.3d 272, 280 (2017) (quoting Wagner v. State, 445 Md. 404, 418, 128 A.3d 1, 9 (2015)).

"[W]here a term is not defined by statute, we may refer to the dictionary and give the words their ordinary meaning." State v. Wilson, 471 Md. 136, 160, 240 A.3d 1140, 1154 (2020) (cleaned up). See also Sabisch v. Moyer, 466 Md. 327, 366, 220 A.3d 272, 294 (2019) ("To ascertain the natural and ordinary meaning of [a] term[], we look to dictionary definitions as a starting point, as it is proper to consult a dictionary or dictionaries for a term's ordinary and popular meaning." (Cleaned up)). Merriam-Webster

defines the word "involve," among other things, to mean "to relate closely[.]" *Involve*, Merriam-Webster (2023), https://www.merriam-webster.com/dictionary/involve [https://perma.cc/R5AC-L4DF]. Similarly, Macmillan Dictionary defines "involve," among other things, to mean "to include or affect someone or something in an important way[.]" *Involve*, Macmillan Dictionary (2023), https://www.macmillandictionary.com/us/dictionary/american/involve [https://perma.cc/7LJ9-ER4U].

Collins English Dictionary states that one definition of the term "involve" is "to relate to or affect[.]" *Involve*, Collins English Dictionary (2023), https://www.collinsdictionary.com/us/dictionary/english/involve [https://perma.cc/7AA7-88S7]. And, Merriam-Webster defines the word "involved" as meaning "being affected or implicated" or "having a part in something[.]" *Involved*, Merriam-Webster (2022), https://www.merriam-webster.com/dictionary/involved [https://perma.cc/3T4N-D2HU]. A synthesis of the dictionary definitions of the words "involve" and "involved" demonstrates that the natural and ordinary meaning of the word "involves" includes to relate to, to affect, or to be a part of something.

In accord with the dictionary definitions of the words "involves," we have addressed the meaning of the word "involves" as used in the child sexual abuse statute in case law. In <u>Degren</u>, 352 Md. at 419, 722 A.2d at 896, we considered the definition of the word "involves" in a predecessor to CR § 3-602(a)(4)(i) and explained that it "connotes a broad sense of inclusion, such as an act *relating* to sexual molestation or exploitation." (Citing Merriam-Webster's Collegiate Dictionary 617 (10th ed.) (defining "involve" as "to engage as a participant" or "to have an effect on" and "involved" as "being affected or

- 22 -

implicated")) (emphasis in original). We determined that the use of the word "involves" "appears to expand the scope of the word 'act' from just the deed of molestation or exploitation into something done by the accused that relates to the molestation or exploitation." Id. at 419, 722 A.2d at 896. We have also explained that the use of the word "involves" in the Family Law statute "allows the statute to reach more broadly than if it simply referred to sexual exploitation." B.A., 449 Md. at 140, 141 A.3d at 219.[8] Further, we have stated that because "[o]ne meaning of 'involves' is 'includes,' . . . any conduct that partly is not sexual exploitation and partly is sexual exploitation nonetheless *involves* sexual exploitation." B.A., 449 Md. at 140, 141 A.3d at 219 (citing Merriam-Webster's Collegiate Dictionary (11th ed.), https://www.merriam-webster.com/dictionary/involve [https://perma.cc/UED5-VFFH]) (emphasis in original).

We do not see any ambiguity in the use of the phrase "involves sexual . . . exploitation" in CR § 3-602(a)(4)(i). The common meaning of the word "involves," as expressed in the dictionary and in our opinions, is clear and we give effect to it. After consideration of the ordinary meaning of the word "involves" and our case law, we conclude that the phrase "an act that involves. . . sexual exploitation of a minor," as it is used in CR § 3-602(a)(4)(i), means an act that is related to, affects, or is a part of the sexual exploitation of a minor. This is so because, under the plain meaning of the word "involves," an act that involves sexual exploitation of a minor would relate to, affect, or

---

[8]Because the Family Law Article provision at issue in B.A. and the Criminal Law Article statute at issue in this case originated in the same statute and have largely paralleled each other over the years, as discussed below, we generally interpret the language consistently in both contexts. See B.A., 449 Md. at 127, 141 A.3d at 211.

- 23 -

have a part in the sexual exploitation of the minor. Indeed, we have held that sexual exploitation "can be part of a continuing course of conduct" and result from the effect of the perpetrator's actions as a whole, not parsed individually. Walker, 432 Md. at 624, 69 A.3d at 1088.

Based on the ordinary meaning of the language in the statute, it follows that the phrase "an act that involves sexual . . . exploitation" in CR § 3-602(a)(4)(i) encompasses conduct by an individual, with supervisory responsibility for a minor, that relates to, affects, or is a part of ongoing sexual exploitation of the minor outside of the supervisory setting. Under the plain language of CR § 3-602(a)(4)(i), an expression of anger over a minor's attraction to another person, made in class by a substitute teacher who is sexually exploiting a minor student outside of school, can involve sexual exploitation of the student.[9]

That said, although there is no ambiguity as to the plain meaning of the phrase "an act that involves sexual . . . exploitation[,]" in this instance, we think it is important to point out that the legislative history of the statute confirms our interpretation of its plain language. In 1963, the General Assembly first enacted the civil and criminal prohibitions of child abuse in one statute, codified in former Article 27 of the Maryland Code. See State v. Fabritz, 276 Md. 416, 423, 348 A.2d 275, 279 (1975) (citing 1963 Md. Laws 1536 (Vol.

---

[9]Because we see no ambiguity in the plain language of the statute, we decline Krikstan's invitation to apply the rule of lenity. See Walker, 432 Md. at 627 n.26, 69 A.3d at 1090 n.26. The rule of lenity is "a tool of last resort, to be rarely deployed and applied only when all other tools of statutory construction fail to resolve an ambiguity." Oglesby v. State, 441 Md. 673, 681, 109 A.3d 1147, 1151 (2015) (citation omitted). It "is not a means for determining—or defeating—legislative intent[.]" Id. at 681, 109 A.3d at 1151.

- 24 -

II, Ch. 743, H.B. 922), then codified at Md. Code (1957), Art. 27, § 11A); B.A., 449 Md. at 127 n.2, 141 A.3d at 211 n.2. This represented a public policy decision to improve protections for abused children that were inadequate at common law, which excluded parents and custodians from criminal liability for what was then considered reasonable corporal punishment of children. See Krikstan, 2022 WL 1284081, at *8-9 (Kehoe, J., concurring). This change "established enhanced penalties for those who had a duty to care for and protect children[,]" but did not remove the sanctions for "assaults and batteries on children by individuals who were neither parents nor custodians[.]" Id. at *9 (Kehoe, J., concurring) (citation omitted). In 1970, these provisions were recodified as Art. 27, § 35A. See B.A., 449 Md. at 127 n.2, 141 A.3d at 211 n.2 (citing 1970 Md. Laws 1114 (Ch. 500, H.B. 1044)).[10]

In 1973, the General Assembly added a definition of "abuse" to the statute, see B.A., 449 Md. at 127 n.2, 141 A.3d at 211 n.2 (citing 1973 (Reg. Sess.) Md. Laws 1708-09 (Ch. 835, H.B. 1056)), which encompassed any "'physical injury or injuries sustained by a child as a result of cruel or inhumane treatment or as a result of malicious act or acts[,]'" Walker, 432 Md. at 616 n.21, 69 A.3d at 1084 n.21 (quoting 1973 (Reg. Sess.) Md. Laws 1709). The General Assembly described the statute's purpose as "'the protection of children who have been the subject of abuse.'" Id. at 616 n.21, 69 A.3d at 1084 n.21 (quoting 1973 (Reg. Sess.) Md. Laws 1708); see also 1974 Md. Laws 1888 (Ch. 554, H.B. 1413).

The following year, the General Assembly added a definition of "sexual abuse"

---

[10]In 1994, the General Assembly recodified Art. 27, § 35A as Art. 27, § 35C. See 1994 Md. Laws 3145 (Vol. V, Ch. 712, S.B. 322).

similar to the current statute, for the first time including the phrase "any act or acts involving sexual molestation or exploitation" in the statute. 1974 Md. Laws 1889 (capitalization omitted); see Walker, 432 Md. at 616-17, 69 A.3d at 1084. In 1984, the General Assembly created the Family Law Article, moving the civil child abuse provisions, including the pertinent definitions, to the new Article. See B.A., 449 Md. at 127 n.2, 141 A.3d at 211 n.2 (citing 1984 Md. Laws 1847, 2016-29 (Pt. 3, Ch. 296, H.B. 1)). The same definitions were retained in the criminal provisions in Article 27 and, in 2002, recodified as part of the new Criminal Law Article. See id. at 127 n.2, 141 A.3d at 211 n.2 (citing 2002 Md. Laws 284 (Vol. I, Ch. 26, H.B. 11)). During the recodification, the General Assembly reworded the definition slightly and created a dedicated section for sexual abuse of a child, separate from other forms of child abuse. See Walker, 432 Md. at 617 & n.22, 69 A.3d at 1084 & n.22.

The General Assembly's consistent focus on the protection of child abuse victims has led us to continually construe the statutes expansively because the General Assembly, over five decades of legislative history, "has not narrowed this language . . . despite having models from numerous other states to draw upon should it have wished to do so." Walker, 432 Md. at 622, 69 A.3d at 1087. Indeed, the General Assembly has consistently broadened the scope of the statutory language: from parents and custodians alone to others with responsibility for the supervision of minors, from a narrow definition of physical abuse alone to a broader definition of abuse including sexual abuse, see Pope, 284 Md. at 317-21, 396 A.2d at 1060-62, and from covering only those children under 14 years old to encompassing all minors (*i.e.*, everyone under 18 years of age), see Walker, 432 Md. at

- 26 -

616 & n.20, 69 A.3d at 1084 & n.20. "The General Assembly's concern for the welfare of children, and the myriad ways in which abusers can sexually exploit minors, militates against unduly narrowing the scope of a statute that is reasonably worded so as to reach a wide swath of behaviors[.]" Id. at 623, 69 A.3d at 1087-88. This legislative history confirms our conclusion regarding the plain meaning of the word "involves" in CR § 3-602(a)(4)(i) and that, in this case, the evidence was sufficient to support Krikstan's conviction of child sexual abuse.

### *Relevant Case Law*

Our case law concerning the definition of the word "involves" in the child abuse statute and the broad construction of statutes involving child sexual abuse, in general, guides our holding in this case. In Degren, 352 Md. at 404, 722 A.2d at 888, we affirmed a child sexual abuse conviction because the defendant was "a person with responsibility for a minor child who fail[ed] to prevent that child from being raped while the child [was] in her presence[.]" The defendant and her husband took care of the minor for a few weeks in the summer under an arrangement with the victim's mother. See id. at 405, 722 A.2d at 889. "There was evidence, if believed by the trier of fact, as apparently it was, that on two occasions . . . petitioner not only knew her husband was engaged in sexual intercourse with [the minor], but sat on the same bed and watched" and that the defendant "was aware of and witnessed [another man] and [the minor] engaged in sexual intercourse in the [] home" on another date. Id. at 425, 722 A.2d at 899.

We held that the defendant's "failure or omission to act in allowing [the minor] to be raped, molested, and exploited, constituted sexual abuse pursuant to" the child abuse

- 27 -

statute. Id. at 428, 722 A.2d at 900. The defendant contended that she should not be criminally liable for the sexual abuse of the minor "because her omission or failure to prevent another person's act of sexual molestation or exploitation [was] not punishable under the language of the statute" and argued "that the plain meaning of the word 'act' as used in [the statute] denotes a deed or something affirmative as opposed to an omission." Id. at 409, 722 A.2d at 891. As a result, we assessed whether an act that involves sexual molestation or exploitation includes a failure to prevent the molestation or exploitation of a minor. See id. at 409, 417, 722 A.2d at 891, 895.

In determining the meaning of the word "act" in the statute, and whether it includes an omission or failure to act, we found significant that "the word 'act' in the definition of sexual abuse is modified by the phrase 'that involves sexual molestation or exploitation.'" Id. at 419, 722 A.2d at 896 (cleaned up). Observing that "the word 'involves' connotes a broad sense of inclusion, such as an act relating to sexual molestation or exploitation" we concluded that this language "appears to expand the scope of the word 'act' from just the deed of molestation or exploitation into something done by the accused that relates to the molestation or exploitation." Id. at 419, 722 A.2d at 896 (citation omitted).

From our perspective, the word "act" in the definition of sexual abuse was "capable of more than one interpretation," so we turned to legislative history. Id. at 419, 722 A.2d at 896. Specifically, we examined amendments to the child abuse statute and noted that, in 1974, the General Assembly "declared in its definition of abuse that sexual abuse constituted abuse, whether physical injuries are sustained or not." Id. at 421, 722 A.2d at 897 (cleaned up). We explained that this amendment was significant:

> By clarifying that sexual abuse need not necessarily lead to physical injuries in order to be prosecuted, the legislature recognized the extensive emotional, psychological, or physical damage that sexual abuse can cause a child. Given this clear indication of the Legislature's awareness of the pervasive harm caused by sexual abuse, we find it difficult to believe that our law-making body, by this statute, would simultaneously punish an individual who watches and fails to intervene during the physical abuse of a child in her care but not punish that person when the child is raped or sexually molested under the same circumstances.

Id. at 421, 722 A.2d at 897. We thus rejected the defendant's contention and held, after consideration of the purpose of the child abuse statute, the amendments in which the General Assembly "generally expanded the scope of liability and actions constituting child abuse," our case law, and "the modern trend in broadly recognizing and punishing all forms of child abuse," that the definition of sexual abuse in the statute "contemplates not just an affirmative act in directly molesting or exploiting a child, but one's omission or failure to act or prevent molestation or exploitation when it is reasonably possible to act and when a duty to do so, such as in this case, exists." Id. at 424-25, 722 A.2d at 899.

We concluded that use of the word "involves," modifying the word "act" in the statutory definition, implied that the General Assembly "intended to punish not only the deed of molestation or exploitation, but actions that relate to molestation or exploitation." Id. at 425, 722 A.2d at 899. We determined that "the acts of watching [another man] and her husband engage in sexual intercourse with [the minor], even if one believe[d the defendant] herself did not engage in sexual contact with the child, [we]re acts involving the molestation or exploitation of [the minor]." Id. at 426, 722 A.2d at 899.

In Walker, 432 Md. at 592-93 & n.3, 69 A.3d at 1069-70 & n.3, we upheld convictions for sexual abuse and attempted sexual abuse of a minor under CR § 3-602 of a

38-year-old teacher's aide who, while working at an elementary school, "gave to an eight-year-old female student a series of notes in which he repeatedly professed his love for her, shared fantasies of kissing and holding her, and expressed jealousy about her having a boyfriend." The defendant challenged the sufficiency of the evidence for the convictions, conceding that he had temporary care or custody of the minor and that his behavior was "highly inappropriate," but arguing that his actions did not constitute sexual exploitation. Id. at 613-15, 69 A.2d at 1082-83. To determine the meaning of exploitation in the statute, we reviewed its plain language, case law from this Court and the Appellate Court of Maryland, the legislative history of the statute, and the language of similar statutes from other jurisdictions. See id. at 616-23, 69 A.3d at 1083-88.

Because the term "exploitation" is not defined in CR § 3-602, we applied the rules of statutory interpretation, and discerned "several things" from the plain language of the statute itself:

> First, the use of the phrase "an act," instead of an enumerated list of abusive conduct, signals the General Assembly's intent that the child abuse statute be read to include a wide range of behavior. Second, we have observed that the word "involves" implies "a broad sense of inclusion, such as an act relating to sexual molestation or exploitation." *Degren v. State*, 352 Md. 400, 419, 722 A.2d 887 (1999). Finally, the conjunction "or" between sexual molestation and exploitation indicates that only one of the actions, but not necessarily both, is required to support a conviction for child sexual abuse. Although the word "sexual" is not placed in front of exploitation, and could be viewed as not modifying the term, the title of the statute itself, "sexual abuse of a minor," makes clear that the exploitation must be also of a sexual nature.

Id. at 615-16, 69 A.3d at 1083-84.

We next examined the legislative history of the child abuse statute, concluding that

we had not found any legislative history explaining "what the General Assembly intended the word 'exploitation' to mean within the child abuse statute." Id. at 617, 69 A.3d at 1084. We then turned to case law and noted that we had previously observed "that sexual abuse is not limited to the specified acts" listed in CR § 3-602(a)(4)(ii), and that, rather, by stating that "sexual abuse 'includes' these activities, [] we have concluded that th[e] list is meant to be merely illustrative and does not preclude other actions from constituting sexual abuse of a minor." Id. at 617, 69 A.3d at 1084 (citations omitted). Moreover, we stated that "actions constituting child sexual abuse do not have to be otherwise criminal in nature." Id. at 618, 69 A.3d at 1085. And, "child sexual abuse does not have to be limited to a single instance but can be composed of an ongoing series of events." Id. at 619, 69 A.3d at 1085. Thus, we "observed that the gravamen of the offense of child abuse is not the sexual act itself but rather the abuse of the child. That abuse can as easily arise from several qualifying acts as from one." Id. at 619, 69 A.3d at 1085 (cleaned up). We concluded that "[o]ur case law also makes clear that it is not required that a defendant touch the victim to be guilty of child sexual abuse." Id. at 619, 69 A.3d at 1085.

The defendant contended "that a conviction for child sexual abuse requires 'sexual, physical touching,' not necessarily at the defendant's hands, or, at a minimum, the use of words that are overtly and inherently sexual[,]" and relied on the definition of sexual exploitation used in other state statutes and by the federal government. Id. at 621, 69 A.3d at 1086-87. After reviewing other states' statutes, we concluded that those statutes tended "to be more exact than Maryland's statute in defining what constitutes sexual exploitation[,]" but did not settle the question of whether the defendant's conduct

- 31 -

constituted sexual exploitation of a minor under Maryland law. <u>Id.</u> at 621-22, 69 A.3d at 1087. "Maryland's law is broader and its language more general than that" of the statutes cited by the defendant. <u>Id.</u> at 622, 69 A.3d at 1087.

From our review of Maryland case law, we reached several conclusions regarding CR § 3-602:

> Child sexual abuse can be committed as part of a single act or a series of actions and it is not necessary that the defendant physically touch the child in order to commit the crime. The context in which the abuse occurs matters and failing to act to prevent abuse can be criminal. Finally, exploitation requires that the defendant "took advantage of or unjustly or improperly used the child for his or her *own* benefit."

<u>Id.</u> at 622, 69 A.3d at 1087 (quoting <u>Degren</u>, 352 Md. at 426, 722 A.2d at 900) (emphasis in original). We observed that "[CR] § 3-602 is broad" and that this Court and the Appellate Court of Maryland have "continually construed [CR] § 3-602 in an expansive manner." <u>Id.</u> at 623, 69 A.3d at 1087. We determined that CR § 3-602 is not limited to child pornography and prostitution, but rather encompasses "any act that involves sexual molestation or exploitation of a minor, whether physical injuries are sustained or not." <u>Id.</u> at 622-23, 69 A.3d at 1087. We concluded that this broad language reflected the "General Assembly's concern for the welfare of children, and the myriad ways in which abusers can sexually exploit minors," which "militates against unduly narrowing the scope of a statute that is reasonably worded so as to reach a wide swath of behaviors, including those where a minor is sexually exploited but not physically harmed." <u>Id.</u> at 622-23, 69 A.3d at 1087-88.

In <u>Walker</u>, the defendant, among other things, "characterized his behavior as

- 32 -

inappropriate, perhaps 'creepy,' but not criminal[,]" and argued that our "interpretation is too broad and would encompass activities that are merely romantic or intimate." Id. at 623, 69 A.3d at 1088. We determined that "ample evidence" supported the trial court's conclusion that the defendant's behavior constituted sexual exploitation. Id. at 623, 69 A.3d at 1088. We explained that the context—a 38-year-old man writing to an 8-year-old girl—informed the interpretation of the letters. See id. at 623, 69 A.3d at 1088. We agreed with the State that statements in the letters described activities "that have strong undertones of a physical, sexual relationship" and concluded that the trial court "correctly noted that, taken as a whole, the letters contained passionate comments that almost border[ed] on obsession and feature[d] expressions of jealousy." Id. at 624, 69 A.3d at 1088 (cleaned up).

We explained that, because "[c]hild sexual abuse can be part of a continuing course of conduct and need not hinge on a single action[,]" "[n]either a trial judge or jury, as the fact-finder, nor an appellate court on review of the facts found, needs to parse every statement individually and characterize it as being sexually exploitative or not." Id. at 624, 69 A.3d at 1088. Rather, we concluded that "[t]he effect of the letters as a whole . . . constitute[d] sexual exploitation and, therefore, the crime of child sexual abuse[.]" Id. at 624, 69 A.3d at 1088.

We concluded that, "[t]aken together, the content of the[] notes qualifie[d] as being sexually exploitative." Id. at 625, 69 A.3d at 1089. We stated that it was "difficult to read his words and not conclude they [we]re expressing a passionate form of love that [went] far beyond mere friendship." Id. at 625, 69 A.3d at 1089. However, "[w]e decline[d] to

adopt a definition of exploitation that would require the defendant to personally receive sexual gratification or pleasure out of the conduct." Id. at 625, 69 A.3d at 1089. We determined that the "great pleasure" the defendant described from exchanging notes with the minor "that carried a sexual undertone" led "us to conclude that he 'received a benefit' from his actions and therefore exploited her." Id. at 625, 69 A.3d at 1089. We held that the evidence was sufficient to convict the defendant of child sexual abuse and attempted child sexual abuse. See id. at 625, 69 A.3d at 1089.

In Anderson, 372 Md. at 287-88, 812 A.2d at 1018, another case in which we interpreted the child abuse statute, we were confronted with the question of whether a teacher "was a person with responsibility for supervision of a child" under the child sexual abuse statute, where the "sexual encounter between petitioner and the victim occurred on the last day of the school year, when petitioner gave the victim a ride home from school." After the end of the school day, the minor stayed to help another teacher, accepted a ride home from the defendant, and agreed to stop at his house for a game of pool, where the sexual abuse occurred. See id. at 289, 812 A.2d at 1019. The defendant was convicted of child sexual abuse despite contending that he lacked responsibility for supervision of the minor at the time of the abuse. See id. at 290, 812 A.2d at 1019.

In concluding the evidence was sufficient to sustain the conviction, we were unpersuaded by the argument "that the mutual, implied consent which existed as a result of his position as a teacher ended when he and the victim left the school[.]" Id. at 291, 294, 812 A.2d at 1020, 1022. We agreed with the conclusion of the Appellate Court of Maryland that there was no temporal break in the teacher-student relationship, because the

series of events began at school, where the teacher had responsibility for the supervision of students generally, and the student's mother had "entrusted her not to a particular teacher for a particular activity, but to the school as a whole for the entirety of the school day." Id. at 294-95, 812 A.2d at 1022. We held that the basis for the defendant's supervision was "the school related activity immediately connected to the abuse, in this case the transportation of the student home from school[.]" Id. at 296, 812 A.2d at 1023.

### *Wicomico Cnty. Dep't of Soc. Servs. v. B.A.*[11]

*The Case and Our Holding*

In B.A., 449 Md. at 124-25, 141 A.3d at 210, we assessed a determination by an administrative law judge ("the ALJ") that the respondent, B.A., had not engaged in child sexual abuse under Md. Code Ann., Fam. Law (1984, 2006 Repl. Vol., 2010 Supp.) ("FL (2010)") § 5-701, *et seq.* We concluded that substantial evidence supported the ALJ's determination that B.A., a martial arts instructor, did not engage in sexual abuse under the applicable Family Law statute. See id. at 124-25, 141 A.3d at 212. Although B.A. was not a criminal case, the definition of "sexual abuse" in FL (2010) § 5-701 was almost identical to that in CR § 3-602. See id. at 125-27, 141 A.3d at 210-11. That is, FL (2010)

---

[11]At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the title of the Judges serving on this Court to that of Justices. The name change took effect on December 14, 2022. And, on the same day, this Court amended Maryland Rule 1-202, effective immediately, to state that the title of "Judge" includes a Justice of the Supreme Court of Maryland and the title of "Senior Justice" means a Senior Judge who has been designated to sit on the Court in a case or other judicial matter pending before the Court. For purposes of this opinion, we will use the then-existing title of "Judge" when referring to opinions authored or joined by members of the Court before December 14, 2022.

§ 5-701(x)(1) defined sexual abuse as "any act that involves sexual molestation or exploitation of a child by a parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child[.]" Id. at 125, 141 A.3d at 210 (footnote omitted).

As in this case, in B.A., the relevant facts were uncontested: B.A. had known the minor's family since before her birth, had taught her martial arts at a young age, and became her martial arts instructor again when she was 15. See id. at 128, 141 A.3d at 212. The minor described her relationship with B.A. during class as follows: he was "'really friendly[,]'" he had spoken with her about her "'personal life'" and "'how she was doing[,]'" and he had developed the nickname "'Sunlight'" for her. Id. at 128, 141 A.3d at 212 (brackets omitted). After four or five months of instruction, B.A.'s communications with the victim, by text, phone call, and email, became undisputedly sexual in nature. See id. at 128-29, 141 A.3d at 212. However, all of the communications occurred outside of class—in class, B.A. "did not touch or speak to [the victim] in a sexual manner." Id. at 130, 141 A.3d at 213. Despite the lack of dispute that B.A.'s actions outside of class were sexually exploitative, the ALJ ordered the Department to issue a finding ruling out sexual abuse because B.A. "did not have care or custody or responsibility for the supervision of [the minor] at the time of the sexually exploitative conduct" as required by the statute. Id. at 131, 141 A.3d at 214.

In B.A., id. at 133, 141 A.3d at 215, we stated that there "appear[ed] to be no question that [B.A.] engaged in sexually exploitative conduct with a child[,]" that B.A. had "committed at least one act enumerated in the definition of 'sexual abuse,' namely

encouraging a child to engage in obscene or pornographic photography or poses[,]" and that "[o]ther out-of-class communications between [B.A. and the minor] could also be characterized as sexually exploitative." (Citations omitted). As a result, in B.A., id. at 133, 141 A.3d at 215, we narrowed our inquiry to whether B.A. "was a parent, household or family member, or other person who has permanent or temporary care or custody or responsibility for the supervision of the child." (Cleaned up). Examining the normal, plain meaning of the statutory language, we explained that by using the present tense verb "has," the statute indicated "that the act must take place *while* the person has temporary care or custody or responsibility for supervision." Id. at 134, 141 A.3d at 215 (emphasis in original). We stated that "temporary care or custody" is "equivalent to '*in loco parentis*,' a relatively restrictive classification that arises only when one is willing to assume all the obligations and to receive all the benefits associated with one standing as a natural parent to a child." Id. at 134, 141 A.3d at 216 (cleaned up).

By contrast, "responsibility for . . . supervision" is broader and "denotes accountability" and "emphasizes broad authority to oversee with the powers of direction and decision[,]" and "may be obtained only upon the mutual consent, express or implied, by the one legally charged with the care of the child and by the one assuming the responsibility." Id. at 134-35, 141 A.3d at 216 (cleaned up). We explained that, as such, "a babysitter temporarily has responsibility for the supervision of a child, and so does a school teacher when the child is at school." Id. at 135, 141 A.3d at 216 (citation omitted). Once responsibility for supervision of a minor "has been placed in a third person, it may be terminated unilaterally by a parent by resuming responsibility, expressly or by conduct."

- 37 -

Id. at 135, 141 A.3d at 216 (citation omitted).

We concluded that B.A. had responsibility for supervision of the minor when she was in his martial arts class, "but that responsibility ended when she departed the martial arts studio and her parents resumed their responsibility—thereby terminating the implied consent of the parents and the instructor's duty to supervise." Id. at 136, 141 A.3d at 216. We explained that B.A.'s "subsequent inappropriate behavior in emails and telephone calls occurred when [B.A.] did not have responsibility for [the minor's] supervision during a temporal break in the teacher-student relationship, when [the minor] was usually in her own home[,]" at a time when the minor's parents, not B.A., had responsibility for her supervision. Id. at 136, 141 A.3d at 216-17. Ultimately, we concluded that, as "[r]ephrensible as some of" B.A.'s conduct might have been, his out-of-class behavior was not an act by a person who had temporary care or custody or responsibility for the supervision of a child and thus did not fall within the definition of child abuse under the Family Law statute. Id. at 136-37, 141 A.3d at 217.

In B.A., the Department had essentially conceded that B.A.'s in-class conduct did itself not fall within the statutory definition of child abuse, but contended that B.A. "engaged in grooming behavior in class that linked the time he was responsible for [the minor]'s supervision to his sexually explicit out-of-class communications with her." Id. at 137, 141 A.3d at 217 (footnote omitted). In discussing whether B.A.'s in-class conduct constituted grooming, we concluded that "[a]lthough grooming behavior in class could, in conjunction with sexually exploitative conduct outside of class, support a finding of indicated child sexual abuse, the ALJ's conclusion that there was insufficient evidence for

such a finding here was not clearly erroneous." Id. at 141, 141 A.3d at 220 (footnote omitted).

We explained that the ALJ had found that "there was no evidence of inappropriate behavior during class." Id. at 138, 141 A.3d at 218. The Department argued that "this obstacle could be overcome by adopting an expansive understanding of child sexual abuse in order to protect children." Id. at 139, 141 A.3d at 219. We agreed that it is accurate "that the statute refers to 'any act that *involves* sexual . . . exploitation[,]' and that this allows the statute to reach more broadly than if it simply referred to sexual exploitation." Id. at 139-40, 141 A.3d at 219 (emphasis and ellipsis in original). Recognizing our case law defining the word "involves," we explicitly stated that "[o]ne meaning of 'involves' is 'includes,' so any conduct that partly is not sexual exploitation and partly is sexual exploitation nonetheless involves sexual exploitation." Id. at 140, 141 A.3d at 219 (cleaned up). We nevertheless determined that the Department had failed to point to a single action or course of actions taken by B.A. during class that, in context, was even partly sexual exploitation. See id. at 140, 141 A.3d at 219.

The Department had contended that B.A.'s intent during class was to prepare the minor for out-of-class sexual exploitation, meaning that his in-class behavior involved sexual exploitation under the statute, even if it was not itself sexually exploitative. See id. at 140, 141 A.3d at 219. In response, we were careful to "not rule out this possibility— that is, that an act can 'involve' sexual exploitation because it is performed specifically in order to facilitate sexual exploitation in the future." Id. at 140, 141 A.3d at 219. But, we indicated, where an act performed specifically to facilitate sexual exploitation in the future

- 39 -

is concerned, "it is not enough to show that a teacher built trust with the student during class and subsequently attempted to sexually exploit the student outside of class." Id. at 140, 141 A.3d at 219. We stated that "[t]here would need to be a showing that the teacher took some specific action during class with the specific intention of facilitating sexual exploitation outside of class[,]" instead of "building trust merely in order to facilitate the physically demanding and potentially dangerous martial arts class, as any teacher might do[]." Id. at 140, 141 A.3d at 219. We added that the fact that B.A. "did try to sexually exploit" the minor outside of class was "not, by itself, enough to prove his intentions during class." Id. at 140-41, 141 A.3d at 219.

In B.A., we discussed the necessity of a showing of intent in the context of responding to the Department's argument that, where there is a lack of evidence of inappropriate behavior during class, a court could evaluate the intent behind a person's otherwise appropriate actions with a student in class to determine that the actions involved sexual exploitation by grooming. The purpose of our discussion of the necessity for a showing of intent was not to supercede the definition of the phrase "involves sexual . . . exploitation" in CR § 3-602 as set forth in Degren and Walker. Rather, in B.A., in response to an argument by the Department about acts that may constitute grooming, we discussed that there would need to be evidence that a teacher took some specific action during class with the specific intention of facilitating out-of-class sexual exploitation.

We discussed the type of actions that may have constituted evidence that the teacher "intentionally attempted to use in-class time specifically for the purpose of facilitating out-of-class sexual exploitation of [the] student," and that may have warranted a different

outcome. B.A., 449 Md. at 141, 141 A.3d at 219. We explained that if the martial arts instructor "had given clear indications of romantic feelings during class, then the outcome might be different." Id. at 141, 141 A.3d at 219 (citation omitted). We gave other examples of conduct that may have caused the outcome to be different, such as if the instructor "had said or done anything inappropriate during their conversations immediately after class," while the minor was still in the building. Id. at 141, 141 A.3d at 219 (citation omitted). But, we concluded that although grooming behavior in class, combined with sexually exploitative conduct outside of class, could be sufficient for a finding of child sexual abuse, the ALJ's finding that there was insufficient evidence of indicated child sexual abuse was not clearly erroneous. See id. at 141, 141 A.3d at 220 (footnote omitted).[12]

The facts and circumstances of B.A. are clearly distinguishable from those of this case. Unlike in B.A., where the Department essentially conceded that the instructor's in-

---

[12]Three judges dissented in two separate dissenting opinions. See B.A., 449 Md. at 142, 141 A.3d at 220 (Adkins, J., dissenting); id. at 146, 141 A.3d at 223 (Watts, J., dissenting, joined by Judge Harrell). In one of the dissenting opinions, Judge Adkins concluded that the ALJ's determination was not supported by substantial evidence because she read the Family Law statute more broadly than the majority so as not to require strict correspondence of timing between the acts involving sexual exploitation and the supervisory responsibility, but rather looked to the ongoing nature of the relationship. See id. at 145-46, 141 A.3d at 222-23 (Adkins, J., dissenting). The second dissenting opinion explained that the majority interpreted the statute too narrowly and in a manner at odds with the legislative goal of protecting children from sexual exploitation, particularly in light of the growing occurrence of remote communications in the modern era. See id. at 146-47, 141 A.3d at 223 (Watts, J., dissenting). The second dissenting opinion discussed that "the term 'care' is not limited to contact that occurs when the student, the teacher, or both are on school grounds" given the ability of a teacher to assert authority or control over a student outside of the classroom, and concluded that B.A.'s "ongoing teacher-student relationship with" the minor, coupled with his decision to "undertake[] care for the child outside of the school grounds," resulted in abuse. Id. at 155-56, 141 A.3d at 228 (Watts., J., dissenting).

class behavior did not itself involve sexual exploitation but argued the in-class behavior constituted "grooming," in this case, the State argues that Krikstan's in-school conduct was inappropriate and involved sexual exploitation. With that in mind, unlike in B.A., in which we credited the ALJ's finding that nothing inappropriate happened in class, in this case, based on the evidence, a rational juror could have concluded beyond a reasonable doubt that Krikstan's conversation with A.G. after math class was inappropriate and an expression of romantic feelings, *i.e.*, anger and jealousy, that related to the out-of-school sexual exploitation of A.G., and indeed, that the conversation was a part of Krikstan's continuing out-of-school sexually exploitative relationship with A.G.. In this case, Krikstan's conduct satisfied the definition of the phrase "involves sexual . . . exploitation" as we have described it in Degren and Walker.

This was not a conversation that related to any of Krikstan's academic duties as a substitute teacher or to A.G.'s status as a student. Instead, Krikstan, per A.G.'s testimony, expressed that "[h]e was mad at [her] because [she] told him about Joey[,]" the other adult man to whom she felt attraction. As discussed more fully below, such an expression by a 30-year-old teacher to his 12-year-old student is not appropriate. Perhaps an expression of worry or disapproval born out of concern for the age difference between A.G. and the 21-year-old man could have been appropriate in another context, namely, one in which the teacher himself was not sexually exploiting the child outside of the school. But Krikstan's expression of anger was not only inappropriate, it was also, in the context of his past out-of-class statements to A.G. in which he professed his love for her and his anger about her feelings for Joey, an "indication[] of romantic feelings during class," id. at 141, 141 A.3d

- 42 -

at 219 (citation omitted), and, as contended by the State, an expression of jealousy.

A rational trier of fact could easily have found that Krikstan's in-school expression of anger about A.G.'s attraction to another man was one or more of the following: (1) a demonstration of romantic feelings for A.G., (2) a demonstration of his jealousy of A.G.'s attraction to the other man, (3) an act taken for his own benefit to undermine or stop A.G.'s attraction to another man, or (4) an act taken to further his continued out-of-school sexual exploitation of A.G. Under the circumstances of the case, any one of these alternatives provides the basis for the finding that Krikstan's expression of anger in school was an act that related to, affected, or was a part of his already sexually exploitative relationship with A.G.[13]

Unlike in B.A., where the actions of the martial arts instructor in class were entirely consistent with what he would have done absent any out-of-class sexual exploitation, see id. at 138, 141 A.3d at 218, in this case, in the classroom after math class, Krikstan gave "clear indications of romantic feelings" for A.G. and did something "inappropriate" by discussing his anger and demonstrating jealousy over A.G.'s attraction to another adult man, leading to a different outcome, id. at 141, 141 A.3d at 219 (citations omitted).

---

[13]We see a distinction in the nature of the relationship between the teacher and the minor in this case and in B.A. Krikstan taught as a substitute teacher in Charles County only sporadically in general, and, at A.G.'s school, he taught on only four dates that he selected. These circumstances support an inference that Krikstan chose to substitute teach in A.G.'s math class in November 2017 to convey his anger to her about her attraction to another man. By contrast, the instructor in B.A. was a friend of the victim's family and the family selected the martial arts program, which are circumstances that could support reasonable innocuous inferences from the instructor spending extra time with the minor in class and speaking with her about her personal life. See 449 Md. at 128, 141 A.3d at 212. Krikstan's conduct with A.G. could not support the same innocuous inferences.

Moreover, in this case, at the time of the in-school interaction with A.G., Krikstan had already expressed the same anger about the other adult man, in a sexually exploitative electronic communication. And, after his in-school demonstration of anger and jealousy about the other adult man, Krikstan resumed sexually exploiting A.G. outside of the classroom, including by sending her messages about the other adult man and, among other things, causing her to engage in acts of masturbation. Krikstan's in-school conduct with A.G. falls squarely within the discussion in our case law that the phrase "involves sexual . . . exploitation" means "an act *relating* to sexual molestation or exploitation[,]" Walker, 432 Md. at 616, 69 A.3d at 1083 (quoting Degren, 352 Md. at 419, 722 A.2d at 896) (emphasis in original), and the ordinary, plain meaning of the word "involves." In short, any rational trier of fact could have found without difficulty that Krikstan's conduct in teaching A.G.'s math class and discussing with her in school, after class, his anger about her attraction to another man was related to, affected, and indeed, was part of his already existing sexually exploitative relationship with her.

Krikstan's argument that the State needed to present evidence of specific conduct during class that proved his intention to facilitate sexual exploitation outside of class and that just as in B.A., the State failed to do so, does not take into account that the discussion in B.A. about the need to demonstrate a specific act showing the intention to facilitate sexual exploitation concerned the Court's discussion of the showing necessary for grooming where no inappropriate conduct had occurred in class, rather than the definition of the phrase "involves sexual . . . exploitation" in CR § 3-602(a)(4)(i). In B.A., our primary holding was that the evidence was insufficient to support a finding of indicated

sexual abuse because B.A.'s sexually exploitative conduct had occurred at a time that the instructor did not have responsibility for supervision of the minor. In reaching that holding, the Court did not purport to define the phrase "involves sexual . . . exploitation." After upholding the ALJ's finding that B.A.'s in-class conduct had not been inappropriate, we discussed whether that conduct was sufficient to constitute grooming.

In the context of discussing whether B.A.'s in-class conduct might be considered grooming, we discussed the need for a showing of a specific act with the specific intention to facilitate sexual exploitation. This is not the test that has been developed under our case law for determining whether an act involves sexual exploitation under CR § 3-602(a)(4)(i). Properly understood, our discussion in B.A. indicated that where an allegation of grooming is concerned, a trier of fact may consider whether the act is a specific act taken with the intention of facilitating or furthering sexual exploitation of a minor. In this case, it is not necessary that we address the issue of grooming because it is clear that Krikstan's conduct met the definition of an act that involves sexual exploitation under the statute, without consideration of the concept of grooming.[14]

_____

[14]That said, although we need not directly address the issue of grooming, Krikstan's argument that the State was required to provide evidence of specific conduct proving his intention—above and beyond the nature of the conversation in school in the context of his sexual exploitation—also fails to recognize that, based on the evidence in the case, a rational juror could have inferred that his in-school conduct was intended to facilitate or further his out-of-school sexual exploitation of A.G. Considering the way Krikstan sexually exploited A.G. outside of class both before and after the in-school conversation— having her send semi-nude photos to him, exposing himself to her via FaceTime, instructing her to masturbate, and the like—no rational juror could have found that, during the in-school conversation, Krikstan's intention was to express concern about A.G. being attracted to Joey or that his intention was otherwise harmless. Given that after his in-school

- 45 -

*Amendment of FL § 5-701*

After <u>B.A.</u>, the General Assembly amended FL (2010) § 5-701. <u>See</u> 2017 Md. Laws 3876 (Vol. V, Ch. 651, H.B. 1263). The legislation amended the definition of "sexual abuse" in FL (2010) § 5-701(x)(1),[15] by striking the phrase "a parent or other person who has permanent or temporary care or custody or responsibility for supervision of a child, or by any household or family member[,]" and replacing it with an enumerated list that includes the former categories plus a new category of person who can commit such abuse: "a person who, because of the person's position or occupation, exercises authority over the child."[16] 2017 Md. Laws 3876-77 (capitalization omitted). The legislation also amended FL (2010) § 5-701(b) and (r)[17] but did not amend any of the child abuse or child sexual

---

conversation with A.G., Krikstan continued sexually exploiting A.G. out of school in the same manner as before, a rational juror could easily have found that the in-school conversation was undertaken by Krikstan with the intent to facilitate continued sexual exploitation of A.G.

[15]Currently, the statute's definition of "sexual abuse" is in Md. Code Ann., Fam. Law (1984, 2019 Repl. Vol., 2022 Supp.) § 5-701(y).

[16]The bill made the same change to the definition of "abuse" under FL (2010) § 5-701(b). <u>See</u> 2017 Md. Laws 3876.

[17]The General Assembly amended FL (2010) § 5-701(b) to add that "abuse" does not include "the physical injury of a child by accidental means" and (r) to include in the definition of "mental injury" those mental injuries "caused by an intentional act or series of acts, regardless of whether there was an intent to harm the child." 2017 Md. Laws 3876 (capitalization omitted).

According to the hearing on the legislation, H.B. 1263 (2017), these changes were made in response to this Court's holding in <u>McClanahan v. Wash. Cnty. Dep't of Soc. Servs.</u>, 445 Md. 691, 129 A.3d 293 (2015), and to codify an agency interpretation. <u>See</u> <u>An Act Concerning Family Law – Child Abuse and Neglect – Definitions: Hearing on H.B. 1263 Before the H. Judiciary Comm.</u>, 2017 Leg., 437th Sess. (Md. 2017), <u>available at</u> https://mgahouse.maryland.gov/mga/play/2cdd2ddd-6a78-437e-a73a-5599b0b3e776? catalog/03e481c7-8a42-4438-a7da-93ff74bdaa4c&playfrom=12497000, at 3:32:48 to 3:33:02 [https://perma.cc/PA4L-LUBJ]. In <u>McClanahan</u>, 445 Md. at 694, 711-12, 129

abuse provisions of the Criminal Law Article. See 2017 Md. Laws 3875.

Krikstan argues that the lack of a similar change to the Criminal Law statute means that the General Assembly has been unwilling to broaden the scope of CR § 3-602 in the same way that it did with the Family Law statute. At oral argument, Krikstan's counsel contended that testimony from a hearing on H.B. 1263 (2017) supported his position that the General Assembly's decision to amend the definition of child abuse in the Family Law Article but not in the Criminal Law Article revealed a legislative intent for a more limited definition of child abuse in the criminal context than in the child welfare one. Krikstan's counsel referred to comments at the hearing by Lisae Jordan, of the Maryland Coalition Against Sexual Assault, which, according to Krikstan, allegedly indicated that H.B. 1263 (2017) was intended to change the definition for child abuse investigations in the child welfare context, not in the criminal context. The State, in rebuttal, asserted that the comments attributed to Ms. Jordan were not helpful in determining the General Assembly's intent with respect to the definition of child abuse in CR § 3-602 because the comments referred to language in the bill that arose in response to a different opinion of this Court, not B.A. See McClanahan v. Wash. Cnty. Dep't of Soc. Servs., 445 Md. 691, 129 A.3d 293 (2015).

Having reviewed a recording of the hearing in question, we conclude that the remarks at issue provide no insight as to any intent of the General Assembly to limit or

---

A.3d at 295, 305, this Court reversed a finding that a mother was responsible for child abuse due to mental injury to her young daughter because the ALJ's findings did not include that the mother acted with the intent to hurt the child or reckless disregard for the child's welfare.

- 47 -

expand the application of CR § 3-602.  On March 9, 2017, at the hearing of the House Judiciary Committee on H.B. 1263 (2017), at the outset, Delegate Kathleen Dumais stated that she had authored the bill with the Maryland Department of Human Resources (now the Maryland Department of Human Services) and others.  See An Act Concerning Family Law – Child Abuse and Neglect – Definitions: Hearing on H.B. 1263 Before the H. Judiciary Comm., 2017 Leg., 437th Sess. (Md. 2017), available at https://mgahouse. maryland.gov/mga/play/2cdd2ddd-6a78-437e-a73a-5599b0b3e776?catalog/03e481c7-8a 42-4438-a7da-93ff74bdaa4c&playfrom=12497000 ("Hearing") at 3:28:43 to 3:28:50 [https://perma.cc/PA4L-LUBJ].   Delegate Dumais stated that the bill would clarify definitions regarding care and custody of a child, physical injury, and mental injury, which she characterized as necessary to rectify "some tortured reasoning" by this Court in two opinions.  Id. at 3:28:50 to 3:31:20.  Delegate Dumais's remarks focused on this Court's decision in McClanahan, describing it as taking "twists and turns" in statutory interpretation to overturn a finding of abuse.  Hearing at 3:30:00 to 3:30:26.

At the hearing, the first witness, Rebecca Jones Gaston, the Executive Director of the Social Services Administration of the Department of Human Resources, spoke largely about McClanahan and also discussed B.A., but did not address the Criminal Law Article beyond stating that the General Assembly had removed the requirement to prove intent from the statute concerning child abuse in the Family Law Article while leaving that requirement intact in the criminal context.  See Hearing at 3:31:37 to 3:35:28.  The next witness, Adam Rosenberg, the Executive Director of the Baltimore Child Abuse Center, who also represented the Coalition to Protect Maryland's Children, focused his comments

on the circumstance that children are vulnerable to abuse because they tend to see all adults as authority figures and mentioned B.A. as an example of sexual predators exploiting a loophole in existing law, but did not opine about anything related to the Criminal Law Article. See Hearing at 3:35:30 to 3:37:37. Next, Ms. Jordan testified and spoke of H.B. 1263 (2017) as focused on child abuse investigations and not criminal matters. See id. at 3:38:14 to 3:38:21; id. at 3:39:36 to 3:39:52. Ms. Jordan spoke initially of the bill in general, and thereafter the bulk of her commentary concerned the McClanahan opinion. See Hearing at 3:37:37 to 3:40:12. Ms. Jordan stated that H.B. 1263 (2017) was "needed legislation" that, in her view, corrected the interpretation of the statute made by this Court in McClanahan. Hearing at 3:40:00 to 3:40:08. Finally, almost all questions to the witnesses from House Judiciary Committee members concerning the bill focused on the language proposed in response to the McClanahan case. See Hearing at 3:40:16 to 3:44:38. Given the content of Ms. Jordan's testimony and that of the other witnesses at the hearing and the questions asked by Committee members, it is not possible for us to adopt the conclusion that Ms. Jordan's remarks were, or the hearing was, in any way indicative of an intent by the General Assembly that child sexual abuse have a more limited definition in the criminal context under CR § 3-602 than in the Family Law Article.

What is more, our case law informs us that the circumstance of the General Assembly having changed the FL (2010) § 5-701 definition without making a similar change to CR § 3-602 would be a "weak reed" on which to base a conclusion about legislative intent. Mercer v. Thomas B. Finan Ctr., 476 Md. 652, 700-01, 265 A.3d 1044, 1073 (2021) (citation omitted). Further, as the State points out, the General Assembly's

- 49 -

amendments to the Family Law statute did not concern the definition of child sexual abuse as "an act that involves" sexual exploitation, which is the key language that we must interpret in this case.

Certainly, if the General Assembly had made the same changes to CR § 3-602 as it made to FL (2010) § 5-701, Krikstan would have no argument that his behavior did not fall within the prohibition of the statute. But the inverse does not follow. The General Assembly not adding the language concerning "a person who, because of the person's position or occupation, exercises authority over the child" as a category of person who can commit criminal sexual abuse is not dispositive of our interpretation of the language "involves sexual . . . exploitation" in CR § 3-602(a)(4)(i). In sum, the amendment of FL (2010) § 5-701, without a corresponding change to CR § 3-602, does not inform our analysis in this case.

### *CR § 3-602(a)(4)(i) and This Case*

Even without employing the applicable standard of review, requiring that we take the evidence in the light most favorable to the State, the evidence satisfies the definition of sexual abuse set forth in CR § 3-602(a)(4)(i)—namely, that while responsible for the supervision of A.G., Krikstan engaged in an act that involved, *i.e.*, was related to, affected, or was a part of sexual exploitation of a minor.[18] As explained above, a rational trier of

---

[18]Krikstan did not raise an issue as to whether he was a person with "temporary . . . responsibility for supervision" of A.G. when they talked after math class. CR § 3-602(b)(1). On brief, Krikstan argued that, "[a]lthough [he] had responsibility for the supervision of A.G. when he was subbing for her class, that responsibility ended when she left school, went home, and her mother or other guardian resumed responsibility for her."

fact could have found beyond a reasonable doubt that the most reasonable and obvious inference from Krikstan's conduct was that he substitute taught A.G.'s math class and kept her after class to express his anger about her attraction to another man because he was already engaged in a sexually exploitative relationship with the minor, and that his anger about the other man, which had arisen during the exploitative relationship, was a jealous, romantic, or emotional reaction that was related to the ongoing sexual exploitation.[19]

The evidence demonstrated that Krikstan had an emotional response in school to A.G.'s feelings about a 21-year-old man that was not appropriate for a teacher to have, let alone communicate to a minor. After math class, Krikstan did not discuss algebra or geometry with A.G., but rather communicated that he was "mad" with her about her attraction to a 21-year-old man. The discussion was not appropriate in any sense for the nature of a teacher-student relationship. Further, after the discussion, Krikstan did not report A.G.'s attraction to the adult man to school authorities or take any other responsible action. Nor did Krikstan offer any advice against the attraction or any meaningful feedback to A.G.; he was just mad and jealous.

The anger that Krikstan expressed in school was the same sentiment of anger and jealousy that was expressed when he communicated to A.G. that he was done with her and

---

In other words, Krikstan contended that a temporal break in the teacher-student relationship occurred only with respect to his conversations with A.G. that took place after school hours via electronic communications.

[19]Krikstan contends that inferring that he was expressing jealousy from A.G.'s testimony that he was "mad" with her is a bridge too far. He is wrong. The inference that his anger was an expression of jealousy is an eminently reasonable one, perhaps the most reasonable one, given that Krikstan's emotion came in response to someone he was sexually exploiting telling him of her attraction to someone else.

wished her a nice life with Joey. Once Krikstan expressed that he was mad and upset about Joey in school, he continued the out-of-school sexual exploitation. And, after the in-school expression of anger, Krikstan again expressed the same anger in exploitative communications to A.G. about Joey before substituting in A.G.'s January 11, 2018 reading class. We struggle to see how Krikstan's conversation with A.G. after math class about his anger concerning Joey could be seen as anything other than related to his sexual exploitation of A.G.

As we stated in Walker, 432 Md. at 624, 69 A.3d at 1088, expressing anger or jealousy over the affections of another person is consistent with physical (or romantic) attraction. Just as we found the expressions of jealousy toward the minor's boyfriend in Walker to be part of a continuing course of conduct sufficient to support a finding of sexual abuse, the same result is warranted here based on Krikstan's expression of anger about Joey to A.G. at school. To be sure, Krikstan's in-school conduct was not as extensive as the defendant's in Walker, but the point is that an expression of anger and jealousy in school to a minor about a perceived rival, by a teacher who is sexually exploiting the minor out of school, viewed in context, is conduct related to sexual exploitation of a minor.

At oral argument, Krikstan's counsel contended that "there was not a significant connection rooted in specific evidence linking the in-class conduct with what happened after hours[.]" Not so. The connection between the in-school conversation and the after-hours exploitation was that the conversation was a continuation of Krikstan's expression of anger and jealousy regarding A.G.'s affection for another man, which began initially during his sexual exploitation of her outside of school, and Krikstan resumed his out-of-

- 52 -

school sexual exploitation of A.G., including sending additional messages about the other man, after expressing his anger to her in school. Under these circumstances, it is not possible to divorce Krikstan's in-school display of anger and jealousy about A.G.'s attraction to another man from his out-of-school sexual exploitation of her.

Essentially, Krikstan asks us to conclude that the in-school conversation was not inappropriate enough to be an act that involved sexual exploitation of a minor. Certainly, there could be a factual scenario in which that may be true—such as, for example, if Krikstan had merely expressed concern or an admonishment to A.G. about her having revealed an attraction to an adult man or if he had not been sexually exploiting her himself for weeks before and after the conversation. But, where Krikstan's in-school meeting with A.G. came amidst his ongoing sexual exploitation of her and he reiterated his already-expressed anger and jealousy of her attraction to another man, the in-school conversation was inappropriate enough for a rational trier of fact to find that it was related to sexual exploitation of the minor.[20]

In addition, we cannot agree with the Appellate Court of Maryland that the

---

[20]Moreover, as the State argues, any rational juror may have inferred that Krikstan's conversation with A.G. in the classroom about Joey was emotionally manipulative behavior that was related to his sexual exploitation of the minor. Any rational juror would have been able to understand that a person can seek to manipulate another, particularly a child, by threatening to withhold, or actively withholding, affection or availability and then engaging in a meeting. That such conduct is a well-documented form of emotional abuse, in the domestic violence and child abuse settings, only cements the commonsense appreciation of this dynamic. See, e.g., Off. for Victims of Crime, OVC Help Series for Crime Victims: Child Abuse (For Youth Ages 12 and Older), https://ovc.ojp.gov/ sites/g/files/xyckuh226/files/pubs/helpseries/HelpBrochure_ChildAbuse.html [https:// perma.cc/NY6W-CYBY] (defining emotional abuse to include "withholding affection" and often accompanying physical and sexual abuse).

conversation after math class did not have sexual undertones or that demonstrating that the conversation had such undertones was required under the statute. See Krikstan, 2022 WL 1284081, at *6. Before the in-school conversation, Krikstan told A.G. that he loved her over 100 times, she told him that she loved him back, and the two shared images of unclothed body parts. Given that Krikstan's reaction to A.G. sharing that she was attracted to another man was indisputably anger and jealously, as evidenced by the exploitative Snapchat communication that A.G. saved which included Krikstan messaging A.G. "I loved u so much[,]" and "Fuck it[,] I'm done[,]" it is difficult to understand how a similar reaction in the classroom could be interpreted not to have had romantic or sexual undertones. As we explained in Walker, 432 Md. at 622, 69 A.3d at 1087, sexual exploitation is not limited to acts involving physical contact and can be a part of a single act or a series of actions, and the context in which the abuse occurs matters. The same analysis applies here; it was not necessary for Krikstan to have engaged in conduct with overt or specific sexual undertones—assessed in context, Krikstan's behavior in school was part of a continuing course of conduct related to his sexual exploitation of A.G.

Nor are we persuaded by Krikstan's contention that A.G.'s testimony about the nature of the in-school conversation was too vague to support a conviction because A.G. testified that she could not remember the details. A.G. testified that, in school, Krikstan conveyed a specific emotion, anger, about a specific incident, her revelation of her attraction to Joey—a revelation that occurred during a sexually exploitative relationship that had been ongoing outside of school and led to Krikstan becoming mad and messaging A.G., among other inappropriate things, that he had loved her, but was "done" with her.

A.G.'s testimony provided evidence that Krikstan kept her after class, giving her a late pass, and engaged in a conversation with her in which he was mad and upset about Joey. And, after Krikstan's display of anger in the classroom, the out-of-school exploitation continued. Under these circumstances, A.G.'s testimony was more than specific enough for a rational juror to conclude that Krikstan's in-school behavior was related to sexual exploitation.

We are also not convinced that there was no evidence of a specific benefit to Krikstan from his decision to talk with A.G. in school about his anger over Joey. Although it is difficult to conceive of a sexually exploitative relationship between an adult and a minor as bestowing a benefit, the facts are that Krikstan established a sexually exploitative relationship with A.G. before the in-school conversation, told A.G. that he was "done" with her as a result of her attraction to Joey, and resumed the exploitation after the in-school conversation. The most obvious inference from this conduct is that Krikstan sought to affect the sexually exploitative relationship with A.G., *i.e.*, continue the relationship, and used the in-school conversation to do so, for his own benefit or at a minimum received the benefit of expressing his romantic anger and jealousy in person after class to A.G.[21]

---

[21]A review of A.G.'s testimony reveals that, when asked by the prosecutor what happened after she told Krikstan about Joey, A.G. responded that Krikstan got upset and did not talk to her for three days. Later, when referring to A.G.'s in-school conversation with Krikstan after math class, the prosecutor asked how "this argument about Joey or [Krikstan] being mad and upset about Joey" affected the relationship, and A.G. indicated that there were three days of silence after math class. A.G. testified that Krikstan initiated contact with her again through Snapchat. Both A.G.'s testimony and the exhibits admitted into evidence concerning their communications after math class demonstrate that Krikstan resumed sexually exploitative contact with A.G. after the in-person encounter in school.

Taking the evidence in the light most favorable to the State, any rational juror could have found that Krikstan's conversation with A.G. after her math class was inappropriate and inferred that, at a minimum, Krikstan conveying to A.G. that he was mad and upset about her attraction to another man while serving as a substitute teacher for her math class, at a time that he was responsible for her supervision, related to, affected, or was a part of his sexually exploitative relationship with her. Even if there were other, equally reasonable inferences which could be drawn from the evidence, which in this case there are not, the evidence would have been sufficient to support Krikstan's conviction of child abuse because we would defer to the fact-finder's resolution of such conflicting inferences. See, e.g., Smith v. State, 415 Md. 174, 183-84, 999 A.2d 986, 991 (2010). Under the applicable standard of review, the evidence was more than sufficient for a rational juror to find that, with his in-classroom conduct, Krikstan engaged in an act that involved sexual exploitation of a minor.

### *Conclusion*

We hold that to support a conviction under CR § 3-602, where there is evidence that a person has sexually exploited a minor through electronic communications at a time that the person did not have care, custody, or responsibility for supervision of the minor, there must be a showing that while the person had care, custody, or responsibility for supervision of the minor, the person engaged in an act that related to, affected, or was a part of sexual molestation or exploitation of the minor. The action need not be criminal or overtly sexual in nature. It is sufficient that, viewed in context, the act is related to, affects, or is a part of the sexual molestation or exploitation of the minor.

In this case, we conclude that the evidence was sufficient to support Krikstan's conviction of sexual abuse of a minor under CR § 3-602 and reverse the judgment of the Appellate Court of Maryland.

Lastly, we agree with Judge Kehoe's concurrence

> that language that was intended to expand protection to children in 1963 and in 1976[] now operates to limit the protections that the law affords to children from forms of sexual abuse and exploitation that no one could have possibly foreseen at the times when Crim. Law § 3-602 and its predecessor statutes were enacted.

Krikstan, 2022 WL 1284081, at *9 (Kehoe, J., concurring). If Krikstan had not chosen to discuss his anger with A.G. at school, his actions would have fallen outside of the ambit of CR § 3-602. Just as the potential for that result did not sit well with Judge Kehoe, it does not sit well with us. As such, we echo Judge Kehoe's respectful suggestion that the General Assembly consider modernizing the criminal statutes governing child abuse. See id. (Kehoe, J., concurring).

> **JUDGMENT OF THE APPELLATE COURT OF MARYLAND REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTION TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR CHARLES COUNTY. RESPONDENT TO PAY COSTS.**

Circuit Court for Charles County
Case No. C-08-CR-18-000694
Argued: December 6, 2022

IN THE SUPREME COURT

OF MARYLAND*

No. 18

September Term, 2022

---

STATE OF MARYLAND

v.

KEITH KRIKSTAN

---

Watts,
Hotten,
Booth,
Biran,
Gould,
Eaves,
Battaglia, Lynne A.,
(Senior Justice, Specially Assigned),

JJ.

---

Dissenting Opinion by Hotten, J., which Eaves
and Battaglia, JJ., join.

---

Filed: February 27, 2023

* During the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

Respectfully, I dissent. This case involves serious allegations of sexual abuse of a minor. The dilemma lies in the State seeking a broader interpretation of Md. Code Ann., Criminal Law ("Crim. Law") § 3-602 that extends beyond and constrains the scope of what the General Assembly enacted. I agree with the Appellate Court of Maryland[1] that the State failed to establish that Keith Krikstan ("Respondent") had "permanent or temporary care or custody or responsibility for the supervision" of the minor victim during the relevant period of alleged sexual abuse, but am particularly persuaded by the concurrence of Judge Kehoe of that court. "[T]he inclusion of the requirement of 'permanent or temporary care, custody, or responsibility for the supervision' of the victim as an element of the crime of sexual abuse of a minor is a matter of historical accident that poses a problem in cases in which the abuser does not have 'permanent or temporary care or custody or responsibility for the supervision' of the victim." *Krikstan v. State*, No. 2279, Sept. Term, 2019, 2022 WL 1284081, at *8 (Md. App. Ct. Apr. 29, 2022) (Kehoe, J., concurring) (citation omitted).

The alleged conduct occurred after school, when the minor victim was at home with her family. Crim. Law § 3-602(b)(1) requires that the accused defendant "ha[ve] . . . responsibility for the supervision of a minor[,]" at the time the sexually exploitive behavior occurs. *See Anderson v. State*, 372 Md. 285, 294–95, 812 A.2d 1016, 1022 (2002) (holding that "responsibility" under Crim. Law § 3-602(b)(1) ends once there is a "temporal break

---

[1] During the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

in the teacher and student relationship"); *Wicomico Cnty. Dep't of Soc. Servs. v. B.A.*, 449 Md. 122, 134, 141 A.3d 208, 215 (2016) (noting that the "present tense" language in Crim. Law § 3-601(b)(1) "indicates that the act must take place *while* the person has . . . responsibility for supervision."). The specific conduct at issue did not occur within the parameters of Respondent's "responsibility for the supervision" of the minor victim in accordance with Crim. Law § 3-602(b)(1). Examining the evidence and rational inferences drawn therefrom "in the light most favorable to the [State,]" no "rational trier of fact could have found the essential elements of [sexual abuse of a minor] *beyond a reasonable doubt.*" *Smith v. State*, 415 Md. 174, 184–85, 999 A.2d 986, 991–92 (2010) (emphasis added).

## I.       Respondent's conduct falls outside the scope of Crim. Law § 3-602(b)(1).

In reviewing statutory language, our "primary goal" is "to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied[.]" *Andrews & Lawrence Pro. Servs., LLC v. Mills*, 467 Md. 126, 161, 223 A.3d 947, 967 (2020) (quoting *Lockshin v. Semsker*, 412 Md. 257, 274, 987 A.2d 18, 28 (2010)). We begin with "the plain language to ascertain the General Assembly's purpose and intent." *Mills*, 467 Md. at 161, 223 A.3d at 967 (citation omitted). We avoid statutory interpretations that render language "meaningless, surplusage, superfluous or nugatory." *Id.* at 149, 223 A.3d at 960 (citation omitted). Crim. Law § 3-602(b)(1) provides, in relevant part, "[a] parent or other person who has permanent or temporary care or custody or responsibility for the supervision of a minor may not cause sexual abuse to the minor." By its plain language, the statute has both a temporal and behavioral requirement.

2

First, the State must establish that the accused individual "has . . . responsibility for the supervision of a minor[.]" Crim. Law § 3-601(b)(1).[2] This Court interpreted "responsibility" to mean "accountability," and "supervision" as "broad authority to oversee with the powers of direction and decision[.]" *B.A.*, 449 Md. at 134–35, 141 A.3d at 216 (citing *Pope v. State*, 284 Md. 309, 323, 396 A.2d 1054, 1063 (1979)). An individual obtains "responsibility for supervision of a minor child" only upon "mutual consent, expressed or implied, by the one legally charged with the care of the child and by the one assuming the responsibility." *B.A.*, 449 Md. at 135, 141 A.3d at 216 (citation omitted). Parental consent functions as a temporal limitation on "responsibility" under Crim. Law § 3-601(b)(1). *See Anderson*, 372 Md. at 294–95, 812 A.2d at 1022.

School teachers have "responsibility for the supervision of a minor child" when the child is at school, and parents may "unilaterally" terminate that obligation by "resuming

_____

[2] Respondent falls outside the class of persons who "ha[ve] permanent or temporary care or custody . . . of a minor" under Crim. Law § 3-601(b)(1). In construing Md. Code Ann., Family Law ("Fam. Law") § 5-701 in *B.A.*, this Court cited its prior decisions construing Crim. Law § 3-602, including *Walker v. State*, 432 Md. 587, 69 A.3d 1066 (2013); and *Tribbitt v. State*, 403 Md. 638, 943 A.2d 1260 (2008). 449 Md. at 127, 141 A.3d at 211 ("The definitions of child abuse in the Family Law Article are similar to those that appear in the statute that creates criminal liability for child neglect and abuse.") (citation omitted). In *B.A.*, this Court reaffirmed that "temporary care or custody" is equivalent to "*in loco parentis*," a classification that "arises only when one is willing to assume all the obligations and to receive all the benefits associated with one standing as a natural parent to a child." 449 Md. at 134–35, 141 A.3d at 216 (quoting *Pope*, 284 Md. at 323, 396 A.2d at 1063). As a substitute teacher, Respondent did not fall within this class of people because he is not A.G.'s parent and he lacks permanent or temporary custody of A.G. Thus, the State had the burden to establish that Respondent fell within the remaining category of individuals who "ha[ve] responsibility for the supervision of a minor[.]" Crim. Law § 3-601(b)(1).

responsibility, expressly or by conduct." *B.A.*, 449 Md. at 135, 141 A.3d at 216 (citation omitted). The teacher "may not prevent return of responsibility to the parent[,]" nor may the teacher freely "relinquish that responsibility without the knowledge of the parent." *Id.*, 141 A.3d at 216 (citation omitted). Therefore, the State must establish that the teacher's conduct occurred *at the time* they "ha[d] . . . responsibility" under Crim. Law § 3-601(b)(1), which ends once there is a "temporal break in the teacher and student relationship[,]" *i.e.*, when the parents resume responsibility. *Anderson*, 372 Md. at 294, 812 A.2d at 1022.

Second, the State must establish that the defendant sexually abused the minor child. The statute defines "sexual abuse"[3] as "an act that involves sexual molestation or exploitation of a minor, whether physical injuries are sustained or not." Crim. Law § 3-602(a)(4)(i). Although Crim. Law § 3-602 does not define "exploitation," this Court has previously approved the following definition: "the defendant took advantage of or unjustly or improperly used the child for his or her *own* benefit." *Walker*, 432 Md. at 622, 69 A.3d at 1087 (cleaned up) (quoting *Degren v. State*, 352 Md. 400, 426, 722 A.2d 887, 900 (1999)). In defining "exploitation," this Court made the following observations: (1) the plain language in Crim. Law § 3-602 is broad and encompasses acts "*relating* to sexual molestation or exploitation[]"; (2) the exploitation must be "of a sexual nature[]"; (3) conduct that constitutes child sexual abuse does not "have to be otherwise criminal in

---

[3] Under the statute, "sexual abuse" includes, but is not limited to: "incest[,]" "rape[,]" "sexual offense in any degree[,]" and "unnatural or perverted sexual practices." Crim. Law § 3-602(a)(4)(ii); *Walker*, 432 Md. at 617, 69 A.3d at 1084 ("[S]exual abuse is not limited to the specified acts of incest, rape, sexual offense in any degree, sodomy, and unnatural or perverted sexual practices listed in [Crim. Law] § 3-602(a)(4)(ii).").

nature[]"; and (4) child sexual abuse "can be composed of an ongoing series of events[,]" and it "does not have to be limited to a single instance[.]" *See Walker*, 432 Md. at 616, 618–19, 69 A.3d at 1084–85.

### A. Respondent did not have "responsibility for the supervision of" A.G. at the time of the sexually explicit communications.

The case at bar does not support a finding that Respondent sexually exploited A.G. when he "ha[d] responsibility for [her] supervision[.]"

In *B.A.*, a martial arts instructor exchanged sexually explicit electronic messages with his fifteen-year-old student over six months. 449 Md. at 128–30, 141 A.3d at 212. In that case, an administrative law judge ("ALJ") found that the sexually explicit communications fell outside the scope of Fam. Law § 5-701 because they all occurred after class when the instructor and student were physically apart, *i.e.*, when the instructor did not have "responsibility for the supervision" of the minor. *Id.* at 131, 141 A.3d at 213–14. This Court agreed with the ALJ, reasoning that there was no evidence that any sexually explicit conversations, texting or emails, or sexual touching occurred during class. *Id.* at 138–42, 141 A.3d at 218–20. This Court emphasized that, although "innocuous actions" may be sexually exploitive if "they are sexual in context, and the adult performing the actions receives benefit from them[,]" building trust with a student during class is not sexual exploitation. *Id.* at 140–41, 141 A.3d at 218–20.[4]

---

[4] The Court noted that the outcome might be different "[i]f there was any evidence that [the instructor] intentionally attempted to *use in-class time specifically for the purpose of facilitating out-of-class sexual exploitation of his student*[.]" *B.A.*, 449 Md. at 141, 141 A.3d at 219 (emphasis added).

In *Walker*, a teacher provided his eight-year-old student several notes during class in which he "professed his love for her, shared fantasies of kissing and holding her, and expressed jealousy about her having a boyfriend." 432 Md. at 592, 69 A.3d at 1069. This Court rejected the teacher's arguments that sexual exploitation exclusively required physical acts, reasoning that, in context, the teacher's notes to his student constituted sexual exploitation because he made several references to inappropriate physical touching, jealousy, romantic affection, and "hints that these fantasies could be acted upon if [the child] chose to do so." *Id.* at 625, 69 A.3d at 1089. This Court declined "to adopt a definition of exploitation that would require the defendant to personally receive sexual gratification or pleasure out of the conduct." *Id.*, 69 A.3d at 1089. This Court concluded that the teacher "received a benefit" from the sexual undertone in the notes, which satisfied the requirements of "exploitation" under Crim. Law § 3-602. *Id.* at 626, 69 A.3d at 1089.

Although Respondent does not dispute that the electronic communications were sexually explicit, he argues that the State failed to present sufficient evidence of in-class conduct that itself was sexually exploitive or specifically tailored to facilitate future sexual exploitation. Contrary to the State's argument, Respondent's mere presence in the classroom as A.G.'s substitute teacher did not "involve" sexual exploitation under Crim. Law § 3-602. The record reflects that Respondent substituted for A.G.'s middle school four times: October 16–17, 2017 (A.G.'s science class); November 15, 2017 (A.G.'s math class); and January 11, 2018 (A.G.'s reading class). Among those four instances, Respondent and A.G. only interacted twice: (1) during science class, where Respondent inquired what A.G.'s best friend had told her about him, and (2) during math class, where

Respondent and A.G. allegedly had a conversation concerning Joey, with whom A.G. was infatuated. The State presented insufficient evidence that either of these interactions, independently or cumulatively, amounted to sexual exploitation of A.G. under Crim. Law § 3-602.

> 1. *The first conversation in science class.*

Regarding the first conversation, there is no evidence Respondent "unjustly or improperly used [A.G.] for his [] own benefit[,]" because they had *just* met and would not physically meet again for at least another month. *Walker*, 432 Md. at 620, 69 A.3d at 1086 (quoting *Degren*, 352 Md. at 426, 722 A.2d at 900). Although Respondent acquired A.G.'s phone number a week after this conversation, that out-of-class conduct "is not, by itself, enough to prove his intentions during class." *B.A.*, 449 Md. at 140–41, 141 A.3d at 219. This first conversation falls closer to being "really friendly" or "[b]uilding trust with a student[,]" which is insufficient to convict Respondent under Crim. Law § 3-602.

> 2. *The second conversation in math class.*

Regarding the second conversation, an insufficient nexus existed between Respondent's in-class conduct and his sexually explicit conduct which occurred *after* school hours. A.G. testified that she "stayed after class[]" "[b]ecause [she and Respondent] were talking about Joey." A.G. did not recall Respondent's "specific words[.]" Instead, A.G. recalled the "general idea" of that conversation regarding Respondent's anger about Joey.[5] This is not a case where Respondent gave "clear indications of romantic feelings

---

[5] On direct examination, A.G. testified as follows:

continued . . .

during class," because the record lacks that *specific* information. *B.A.*, 449 Md. at 141, 141 A.3d at 219. The absence of any in-class conduct is fatal to the State's case.

In *B.A.*, this Court cautioned that "[w]e cannot simply import all of [a teacher's] out-of-class behavior into class to satisfy the statutory definition[]" of "sexual exploitation." *Id.* at 139, 141 A.3d at 218. Absent evidence of "some *specific* action during class with the *specific* intention of facilitating sexual exploitation outside of class[,]" this case required the jury to "import" Respondent's out-of-class sexually exploitive behavior into this conversation. *Id.* at 140, 141 A.3d at 219 (emphasis added). "Although circumstantial evidence alone is sufficient to sustain a conviction," the jury cannot rest their inferences upon "mere speculation or conjecture." *Smith*, 415 Md. at 185, 999 A.2d at 992 (citations omitted). The State presented evidence of a vague in-class conversation about Joey, which does not establish Respondent's intent to facilitate his ongoing sexually exploitive conduct outside of class.

Just as in *B.A.*, "the record reports very little of what happened during class." 449 Md. at 141, 141 A.3d at 219. It is insufficient for the second conversation to generally

---

. . . continued

[THE STATE]:     What did [Respondent] say to you when you stayed
                 after math class about his feelings towards you?

[A.G.]:          I don't know.

                         *        *        *

[THE STATE]:     Okay. Do you not remember the specific words[?]

[A.G.]:          No.

8

concern Joey because the standard under *B.A.* requires evidence of "*specific action*[*s*] during class with the *specific intention* of facilitating sexual exploitation outside of class" to distinguish Respondent's conduct from actions "any teacher might do[.]" *Id.* at 140, 141 A.3d at 219 (emphasis added) (holding that physically touching a student during martial arts class does not constitute "sexual exploitation" even after the teacher admitted he wished to touch the student in a sexually exploitive manner). The jury could only convict Respondent by "import[ing]" his out-of-class conduct onto his ambiguous second in-class conversation with A.G., but such an inference distorts the temporal and behavioral requirements of Crim. Law § 3-602 and undermines the ruling in *B.A.* *Id.* at 139, 141 A.3d at 218.

Like the martial arts instructor in *B.A.*, Respondent's sexually exploitive conduct began and continued *after* class when Respondent did not have "responsibility for [A.G.'s] supervision[.]" Crim. Law § 3-602(b)(1). It is unclear how Respondent "unjustly or improperly used [A.G.] for his [] own benefit[]" during their second conversation because the details of the conversation are unknown and there is no evidence identifying this conversation as the catalyst for further out-of-class exploitation. *Walker*, 432 Md. at 620, 69 A.3d at 1086 (quoting *Degren*, 352 Md. at 426, 722 A.2d at 900). Although the alleged out-of-class sexual exploitation continued after the second conversation, "it is not enough to show that a teacher [spoke] with the student during class and subsequently attempted to sexually exploit the student outside of class." *B.A.*, 449 Md. at 140, 141 A.3d at 219.

There is also no evidence Respondent coordinated this conversation with A.G. Unlike the teacher in *Walker*, Respondent never passed A.G. any notes or sent her

electronic messages during class. Additionally, there is no evidence that Respondent supervised A.G. during extracurricular activities or otherwise engaged in conduct that might constitute "an indivisible, ongoing relationship[]" between in-class and out-of-class conduct. *See Anderson*, 372 Md. at 296, 812 A.2d at 1023 (holding that parental consent of "supervision" under Crim. Law § 3-602 extends to "any reasonable assistance that a teacher may provide to assure the child's return home from school").

Lastly, it is immaterial that Respondent provided A.G. with a hall pass to excuse her tardiness after this second conversation because it is innocuous conduct within the context of the classroom. In *B.A.*, the martial arts instructor "spoke at least once about the possibility of engaging in sexual contact during class, such as touching [the minor] inappropriately while she ostensibly practiced a kick[.]" 449 Md. at 138, 141 A.3d at 218. The minor testified that her instructor touched her hips to assist her with a position during class. *Id.*, 141 A.3d at 218. This Court determined that such contact was innocuous because "martial arts classes frequently involve this sort of contact and even [the minor] said that it was to assist her with a position in class." *Id.*, 141 A.3d at 218. To distinguish the instructor's conduct from actions that "any teacher might do[,]" this Court required evidence that "the teacher took some specific action during class with the specific intention of facilitating sexual exploitation outside of class[.]" *Id.* at 140, 141 A.3d at 219.

In the case at bar, the State, at best, presented evidence that Respondent and A.G. discussed Joey in some respect, and Respondent provided A.G. with a hall pass to excuse her tardiness for her next class. In this context, a hall pass to excuse a tardy student is just as innocuous as physical contact during martial arts class because it is conduct that "any

10

teacher might do[.]" *Id.*, 141 A.3d at 219. It is commonplace for students to remain after class to discuss matters with their teachers only for them to lose track of time. Under these circumstances, a hall pass is innocent conduct, absent further evidence of the details of the second conversation that could elevate the second conversation into sexual exploitation. That information is missing from the record and cannot be imported from Respondent's out-of-class conduct without expanding the temporal requirement under Crim. Law § 3-602(b)(1) beyond its scope.

Indeed, this Court can only elevate the hall pass into the "specific action" required under *B.A.* by doing exactly what *B.A.* sought to avoid, that is, "import[ing] all of [Respondent's] out-of-class behavior into class[.]" *Id.* at 139–40, 141 A.3d at 218–19. However, such a construction distorts the temporal requirement of Crim. Law § 3-602(b)(1) because that out-of-class conduct occurred outside the scope of Respondent's "responsibility for the supervision of" A.G. *Pope*, 284 Md. at 325, 396 A.3d at 1064 ("[W]e cannot reasonably conclude that the [General Assembly], in bringing a person responsible for the supervision of a child within the ambit of the child abuse law, intended that such responsibility attach *without the consent criteria we have set out. Were it otherwise, the consequences would go far beyond the legislative intent.*" (emphasis added)); *Anderson*, 372 Md. at 294–95, 812 A.2d at 1022 (noting that "responsibility" under Crim. Law § 3-602(b)(1) ends once there is a "temporal break" in the teacher student relationship"). Respondent did not have "responsibility" for A.G.'s supervision after class, and this Court cannot convert innocuous or general conduct, such as the second conversation and the hall pass, into sexual exploitation in order to satisfy Crim. Law § 3-

11

602(b)(1). Therefore, the State failed to establish a nexus between Respondent's out-of-class sexually exploitive conduct and any in-class conduct which can sustain a conviction under Crim. Law § 3-602.

## II. The "responsibility" requirement of Crim. Law § 3-602 is a matter of historical accident.

In his concurrence, Judge Kehoe noted that the supervision requirement under Crim. Law § 3-602(b)(1) "is a matter of historical accident that poses a problem in cases in which the abuser does not" have a custodial or supervisory role over the victim at the time of the sexual abuse. *Krikstan*, 2022 WL 1284081, at *8 (Kehoe, J., concurring).

Initially, parents and individuals in *loco parentis* could "us[e] a reasonable amount of force upon a child for the purpose of safeguarding or promoting the child's welfare." *Id.* (Kehoe, J., concurring) (citing *Bowers v. State*, 283 Md. 115, 126, 389 A.2d 341, 348 (1978)). Provided that "chastisement was moderate and reasonable, in light of the age, condition and disposition of the child, and other surrounding circumstances, the parent or custodian would not" be criminally liable for common law assault and battery. *Krikstan*, 2022 WL 1284081, at *8 (Kehoe, J., concurring) (citation omitted). During the 1950s and 1960s, pediatricians and other professionals uncovered evidence showing that "the incidence and violence of parental attacks on children were far greater than anyone had ever anticipated." *Id.* (Kehoe, J., concurring). As a result, the legislatures in each of the fifty states enacted laws to providing "additional protections for abused children." *Id.* (Kehoe, J., concurring).

12

Maryland first enacted the "Assault of Child" statute in Chapter 743 of the Laws of 1963, then codified as Md. Code, Article 27A § 11A. *Id.* at *9 (Kehoe, J., concurring) (citation omitted). The statute "made it a felony for any 'parent . . . or other person' having 'permanent or temporary care or custody of a minor child' to maliciously beat, strike or mistreat the child to such a degree 'as to require medical treatment.'" *Id.* (Kehoe, J., concurring) (citation omitted). In 1973, the General Assembly amended the statute to include "any parent or custodian who 'causes abuse' to a child under the age of eighteen years." *Bowers*, 283 Md. at 119, 398 A.3d at 344 (citation omitted). During that time, the term "abuse" was defined as:

> [P]hysical injury or injuries sustained by a child as a result of [c]ruel or inhumane treatment or as a result of malicious act or acts by any parent, adoptive parent or other person who has the permanent or [t]emporary care or custody or responsibility for supervision of a minor child.

*Id.*, 398 A.3d at 344 (citation omitted). As Judge Kehoe explained:

> [T]he effect of the child abuse statute was not to decriminalize assaults and batteries on children by individuals who were neither parents nor custodians; rather the statute established enhanced penalties for those who had a duty to care for and protect children.

*Krikstan*, 2022 WL 1284081, at *9 (Kehoe, J., concurring) (citation omitted). Thereafter, the General Assembly enacted Chapter 554 of the Acts of 1974 to include "exploitation" within the definition of child abuse. *Id.* (Kehoe, J., concurring) (citation omitted). Then, in 1976, the General Assembly expanded the definition of "abuse" to include "any sexual abuse of a child, whether physical injuries are sustained or not." *Id.* (Kehoe, J., concurring) (citation omitted). Lastly, in 2002, the General Assembly repealed the child abuse statute

13

and recodified it as Crim. Law § 3-601 and Crim. Law § 3-602, which apply to child abuse generally and child sexual abuse. *Id.* (Kehoe, J., concurring). Throughout its legislative history, the scope of Crim. Law § 3-602 remained limited to the same class of individuals subject to the Assault of Child statute of 1963, *i.e.*, individuals who had "permanent or temporary care or custody or responsibility for the supervision" of the victim. *Id.* (Kehoe, J., concurring). Judge Kehoe concluded that:

> [The] language that was intended to expand protection to children in 1963 and in 1976, now operates to limit the protections that the law affords to children from forms of sexual abuse and exploitation that no one could have possibly foreseen at the times when Crim. Law § 3-602 and its predecessor statutes were enacted.

*Id.* (Kehoe, J., concurring). I agree. As Respondent correctly notes, the General Assembly has not codified a statute criminalizing "grooming."[6] As Judge Kehoe observed, Crim. Law § 3-602 is too rigid to fully address the elements of "grooming," which is largely preparatory in nature and often occurs outside the scope of any supervisory role, as demonstrated in this case. *Id.* (Kehoe, J., concurring).

Although there is no definition for "grooming,"[7] academic literature, binding authority, and persuasive authority coalesce into the following hallmarks of "grooming": a

---

[6] The Appellate Court expressly did not decide whether "grooming" constitutes "sexual abuse" under Crim. Law § 3-602 or how circuit courts should address "grooming" at trial. *Krikstan*, 2022 WL 1284081, at *7.

[7] "[W]ithin the context of sexual offending against children, the term 'grooming' has never been properly defined." Anne-Marie McAlinden, *Setting 'Em Up: Personal, Familial, and Institutional Grooming in the Sexual Abuse of Children*, 15 SOC. & LEGAL STUD. 339, 341 (2008).

sexual predator deliberately engages in conduct to develop a connection with the minor in order to lower the child's inhibitions and, ultimately, expose the child to sexually explicit conduct. Academia describes "grooming" as "the situation whereby a potential offender will set up opportunities to abuse by gaining the trust of the child in order to prepare them for abuse either directly or . . . through [electronic communications.]" Anne-Marie McAlinden, *Setting 'Em Up: Personal, Familial, and Institutional Grooming in the Sexual Abuse of Children*, 15 SOC. & LEGAL STUD. 339, 340 (2008). Predators "groom" children through these relationships and "skil[l]fully manipulate[] a child into a situation where he or she can be more readily sexually abused and is simultaneously less likely to disclose[.]" *Id.* at 346. In *Vigna v. State*, this Court referenced an expert's description of grooming, which defined the term as a process "in which an abuser gains a child's trust through special attentiveness[.]" 470 Md. 418, 447, 235 A.3d 937, 953 (2020) (citing *Coates v. State*, 175 Md. App. 588, 607, 930 A.2d 1140, 1151 (2007)). In *Walker*, this Court cited to the Fourth Circuit's definition of "grooming":

> Grooming refers to deliberate actions taken by a defendant to expose a child to sexual material; the ultimate goal of grooming is the formation of an emotional connection with the child and a reduction of the child's inhibitions in order to prepare the child for sexual activity.

432 Md. at 602 n.10, 69 A.3d at 1075 n.10 (quoting *United States v. Engle*, 676 F.3d 405, 412 (4th Cir 2012)) (citations omitted). In *United States v. Wooden*, the Fourth Circuit also described "grooming" as a predator's "careful and deliberate[]" efforts to "gain their [victim's] trust and affection before attempting to make sexual contact." 693 F.3d 440, 457 (4th Cir. 2012). Congress also enacted a child sexual exploitation statute that generally

15

requires an individual to induce or coerce a minor to engage in sexually explicit conduct for the purpose of producing a photograph or video thereof. 18 U.S.C. § 2251(a). Thus, "grooming" behavior may blur the line between the temporal and behavioral requirements of Crim. Law § 3-602, because "grooming" entails "an ongoing series of events" that culminate in sexually explicit conduct. *See Walker*, 432 Md. at 619, 69 A.3d at 1085. More expansive language can further "[t]he General Assembly's concern for the welfare of children, and the myriad ways in which abusers can sexually exploit minors[.]" *Id.* at 623, 69 A.3d at 1087–88.

Currently, the temporal requirement limits the extent to which Crim. Law § 3-602 recognizes conduct outside the scope of "responsibility" as "exploitation." *See B.A.*, 449 Md. at 139, 141 A.3d at 218 ("We cannot simply import all of [a teacher's] out-of-class behavior into class to satisfy the statutory definition[]" of "sexual exploitation[.]"). Even a broad reading of *B.A.* demands evidence of *some* in-class conduct that is "related to" the ongoing exploitation in order to satisfy the "responsibility" requirement. *Id.*, 141 A.3d at 218–19. As demonstrated in this case, the nexus between "supervision" and "sexual exploitation" does not always exist when an abuser "grooms" a victim. Indeed, it appears the reach of Crim. Law § 3-602 ends once the abuser happens to be off the clock. That limitation is cause for deep concern in a world where sexual abuse can begin at night through electronic communications and remain outside entirely outside the classroom. Accordingly, I recommend that the General Assembly consider amending Crim. Law § 3-

16

602 to account for conduct that, by itself, amounts to "sexual abuse," even when it occurs outside the scope of "responsibility."[8]

## CONCLUSION

Without a temporal nexus between Respondent's exploitive conduct during school and after school, there was insufficient evidence for the jury to convict Respondent beyond a reasonable doubt. Currently, Crim. Law § 3-602 does not address Respondent's out-of-class conduct, which he concedes constitutes sexual exploitation; but for the "supervision" requirement. I am in agreement with Judge Kehoe's concurrence and his suggestion "that the General Assembly should consider addressing this anomaly by enacting appropriate legislation." *Krikstan*, 2022 WL 1284081, at *9 (Kehoe, J., concurring). For these reasons, I respectfully dissent and would affirm the judgment of the Appellate Court of Maryland.

Justices Eaves and Battaglia have authorized me to state that they join in this opinion.

---

[8] The majority's analysis provides an attempt to reconcile the actions of the defendants in *B.A.* and *Walker* regarding what falls within the ambit of sexually exploitative behavior, thereby greatly expanding the temporal requirement of "responsibility for supervision of a minor[.]" By conceding that the General Assembly should amend the statute, the majority illustrates the perplexing conflict in its reasoning.

17